**BALTIMORE TRANSFER CO. et al. v. INTERSTATE COMMERCE COMMISSION et al.**

Civ. No. 6025.

United States District Court, D. Maryland.

June 30, 1953.
Judgment Affirmed Nov. 30, 1953.
See 74 Sup.Ct. 225.

---

James J. Doherty and Sigmund R. Kallins, Baltimore, Md., and Spencer T. Money, Washington, D. C., for plaintiffs.

560

Leo H. Pou, Edw. M. Reidy, James E. Kilday and Willard R. Memler, Washington, D. C., for Interstate Commerce Commission.

Bernard J. Flynn, U. S. Atty., Baltimore, Md., and Paul C. Wolman, Jr., Asst. U. S. Atty., Baltimore, Md., for United States.

Before SOPER, Circuit Judge, and COLEMAN and CHESNUT, District Judges.

WILLIAM C. COLEMAN, District Judge.

This is an action brought under Sections 1336, 2284, and 2321–25, Title 28, U. S. Code, to vacate and set aside certain orders of the Interstate Commerce Commission issued in proceedings under Sections 5 and 210a(b) of the Interstate Commerce Act, 49 U.S.C.A. §§ 5 and 310a(b), approving the purchase by one motor carrier of the operating rights of two other motor carriers and granting, pending consummation of such purchase, temporary authority to the purchasing carrier to lease the operating rights of one of the other carriers.

The material facts with respect to the proceedings before the Commission which led up to the present suit are as follows: The Commission, acting on an application filed on February 6, 1950 under Section 5, approved and authorized the purchase by Quinn Freight Lines, Inc., hereinafter referred to as "Quinn", for $16,000 the operating rights and six vehicles of Thomas F. Neale (Agnes B. Neale, Administratrix), doing business as T. F. Neale, hereinafter referred to as "Neale"; and for $10,000 the operating rights of Jessie B. Wadkins, doing business as Ace Truck Lines, hereinafter referred to as "Wadkins", all of these parties being common carriers by motor vehicle in interstate commerce. In the same proceedings, the Commission, acting under Section 210a(b), authorized Quinn to lease the operating rights of Neale pending final determination of the Section 5 application. This application showed that Quinn already held extensive authority from the Commission to operate as a motor common carrier of general commodities, including authority so to operate over regular routes between Boston, Mass., and Baltimore, Md.; that the Neale operating rights which Quinn proposed to purchase included the right to transport general commodities over regular routes between Baltimore, Md., and Reedville, Va., via Washington, D. C., and Fredericksburg and Tappahannock, Va., serving all intermediate and off-route points in five named Virginia counties; and that the Wadkins authority which Quinn sought to purchase was to transport general commodities over a regular route (U. S. Highway No. 1) between Washington, D. C., and Richmond, Va., serving all intermediate points.

The Commission referred the application to an examiner who, on June 28, 1950, submitted his proposed report recommending that the application be denied. The applicant filed exceptions to the proposed report, with the result that on April 12, 1951, the Commission, Division 4, entered its report and order approving the application. On May 17, 1951, the Associated Carriers of Virginia, hereinafter referred to as the "Association", petitioned for, and was granted, leave to intervene in the proceedings, alleging that it was an association composed of 11 motor carriers who were authorized by the Commission to transport general commodities between Baltimore, Md., Washington, D. C., and Richmond, Va. On July 3, 1951, on petition of the Association, and of E. J. Scannell, Inc., another motor carrier, the Commission vacated its previous order approving the application, and ordered the proceeding reopened and set for hearing. On August 16, 1951, the Commission entered an order granting another application that had been filed July 31, 1951, by Quinn and Neale under Section 210a(b) of the Interstate Commerce Act, 49 U.S.C.A. § 310a(b), to lease the motor carrier properties and operating rights of Neale for a period not exceeding 180 days, upon terms and conditions specified in a lease agreement filed with the Commission. The consideration, terms of payment, etc. involved in both the proposed sale and the temporary lease, form no part of the present controversy. This order recited that it appeared to the Commission that failure to grant the application might "result in destruction of or

injury to said properties or interfere substantially with their future usefulness in the performance of adequate and continuous service to the public." On August 31, 1951, the Association petitioned the Commission to reconsider and vacate this order, to which the applicants replied. On November 5, 1951, the Commission entered its order denying the petition for reconsideration. On January 17, 1952, on petition of Quinn and Neale, the Commission entered an order extending the temporary authority granted to Quinn to lease the Neale operating rights "until the application filed * * * under section 5 * * * is finally determined." Meanwhile this application under Section 5 had been referred to an examiner for hearing in which attorneys for the applicants and the Association participated, and, on January 7, 1952, the examiner had filed his report, proposing that the Commission approve Quinn's purchase of the Neale and Wadkins operating rights. The Association filed exceptions to the examiner's report, and the applicants filed their reply to the exceptions. On April 25, 1952, the Commission, Division 4, entered its report and order approving and authorizing the proposed transactions. Thomas J. Lyons—Control; Quinn Freight Lines, Inc.—Purchase—Jessie B. Wadkins and Thomas Fereol Neale (Agnes B. Neale, Administratrix) M.C.F. 4437.

The purpose sought to be achieved by Quinn, the vendee, is to extend operations from Baltimore to Washington and Richmond and various indicated points in Maryland and Virginia, for the purpose of providing a single-line, through service between points in Massachusetts and those in affected territory. Quinn is one of the larger motor carriers operating along the Eastern seaboard. Its corporate history and operations have been fully reviewed by the Commission in previous proceedings. See Quinn Freight Lines, Inc.—Purchase—Marshall, 55 M.C.C. 767; 56 M.C.C. 487, and 57 M.C.C. 567. Quinn transports volume. shipments of freight from Boston to Baltimore, destined to Washington, Richmond, and other points in Virginia. Since 1947, Neale, one of the vendors, has been authorized to operate, over regular routes,

between Reedville, Va., and Baltimore, via Tappahannock and Fredericksburg, Va., and Washington, D. C.; between Warsaw, Va., and Baltimore, via Glen Burnie, Md.; and between T. B., Md., and Washington, serving all intermediate and off-route points in Northumberland, Lancaster, Richmond, Westmoreland, and King Counties, Va. Since 1940, Wadkins, the other vendor, has been authorized to operate, over a regular route, between Washington and Richmond, via Fredericksburg, over U. S. Highway 1, serving all intermediate points, the off-route points of Lorton, Occoquan, Bowling Green, Quantico, and Fort Belvoir, Va., and those in the Washington commercial zone as defined in Washington, D. C., Commercial Zone, 3 M.C.C. 243. Wadkins now has pending an application to extend operations over short segments south of the Virginia-District of Columbia boundary line, and south from Fredericksburg. There are no operating rights under such application which may be acquired by Quinn, the vendee.

The following facts were found by the Examiner and adopted by the Commission: approximately 2½ million pounds of freight are handled weekly by Quinn through its Baltimore terminal, of which an estimated 700,000 pounds are destined to the Washington area, and an estimated 100,000 pounds move to and from points, involved in this proceeding, south of this area. The flow of traffic is predominantly southbound from Massachusetts. The tonnage moving through Baltimore is there interlined with several carriers including Neale, the volume with the latter averaging some 500,000 pounds weekly.

In the course of interchange, shipments are delayed by one day. Also, when at times they are misplaced, there is delay and difficulty in tracing them and damage to the freight increases with the frequency of handling. From five to eight days are consumed in completing deliveries of shipments originating in Boston, destined for Richmond. Under the proposed unified rights the lapsed time would be reduced to two or three days between these points, and first morning service would be afforded between Boston and Washington on truck

loads, and first afternoon or second morning service would be afforded on less-than-truckloads because of the elimination of interchange, including the entire volume with Neale. Under the proposed unification, terminal facilities would be established in Washington, Richmond, and Callao, Virginia. Economy would result from the elimination of labor and re-billing, and the reduction in claims occasioned by interchange. The vendee would take over the vendors' employees.

The Association opposed the application on the ground that (1) the four carriers who instituted the proceeding were providing adequate service; (2) they had facilities for accommodating additional freight; (3) they were experiencing strong competition; and (4) Quinn would divert tonnage from them. On the other hand, applicants sought approval of the unification on the ground that unified service would be responsive to the requirements of shippers generally, and would enable the vendee to effectuate savings, thereby strengthening its financial status.

All of the present plaintiffs are motor carriers operating under individual certificates of Public Convenience and Necessity issued to them by the Commission for the transportation of freight within the areas involved in the proceedings before the Commission; and all of them were parties protestant in those proceedings. The operations of three of them, i. e., East Coast Freight Lines, hereinafter referred to as "East Coast", Baltimore Transfer Company, hereinafter referred to as "Transfer", and Brooks Transportation Company, hereinafter referred to as "Brooks", were set forth in detail in the Commission's findings from which we take the following: East Coast operates five days weekly between Richmond and New York City over regular routes, serving all intermediate points and certain off-the-route points, with service out or north of Washington, except to Baltimore, restricted to pick-up southbound and delivery northbound, and service south thereof restricted to pick-up northbound and delivery southbound; and also service at Baltimore is restricted purely to traffic to or from points south of Alexandria. East Coast utilizes some 37 tractors, 41 trailers, and a numbers of trucks and maintains terminals in Richmond, Washington, Baltimore and other points. It affords overnight service between Richmond and Baltimore, averaging daily three trailer loads southbound and from three to six northbound. It interchanges New England traffic usually at New York City and occasionally at Baltimore, giving third morning service. While its vehicles normally operate at capacity, it is in a position to handle additional tonnage. Transfer operates over a regular route between Petersburg, Virginia and New York City, serving certain intermediate and off-route points, including Alexandria, Virginia, Petersburg, and Washington, as well as points between five miles of each, and Baltimore and points within ten miles thereof. Transfer uses 51 trucks, 149 tractors, and 221 trailers, with terminals in Richmond, Washington, Baltimore and other points. It usually renders overnight service. During the first six months of 1951 Transfer handled over 55,000 tons of freight with the resulting revenue of over $800,000, which would be subject to substantial competition from vendee on tonnage moving between Baltimore and Richmond, between New York City Metropolitan area and Richmond, and also between the same area and Washington. Transfer interchanges New England traffic at New York City, Jersey City, New Jersey, and occasionally at Philadelphia. It conducts a successful business in spite of the fact that there are substantial carriers whose routes practically parallel its own. It has not had any competition from the present vendors. Brooks operates principally over regular routes between New York City and Winston-Salem, North Carolina; Philadelphia, Baltimore, Washington, Fredericksburg, Richmond and Lynchburg, serving all intermediate points and certain off-route points and those within 45 miles of Washington and 30 miles of Columbus Circle, New York. Brooks uses 41 trucks, 177 tractors, 250 trailers and maintains terminals in Richmond, Fredericksburg, Washington, Baltimore and other points. Between Richmond and New York

City and intermediate points Brooks performs a daily overnight service. Brooks receives comparatively small tonnage in interchange from vendee, and its transfer of shipments to the latter has been small. It experiences competition from many carriers but not from vendors. It opposes the proposed unification on the ground that it would possibly lose some traffic between Richmond and Baltimore and Washington.

Five shippers testified before the Examiner in support of the application. They are all located in Boston or other Massachusetts points. They ship to Washington, and Virginia points. Vendee handles the freight from all of these shippers to Baltimore and there interlines it with a connecting carrier.

The Commission found there was no evidence of any dissatisfaction with or deficiency in the service of the opposing carriers, and also that they are capable of handling additional traffic. Competition in their territory is substantial, but Neale's and Wadkins' operations have been of little or no competitive consequence so far as opposing carriers are concerned. Nevertheless, Neale and Wadkins have conducted operations within the scope of their rights, and have rendered service on the scale commensurate with their financial resources, equipment and other facilities and traffic tendered them. The opposing carriers do not serve directly a very large portion of the area in the five Virginia counties embraced in Neale's certificate. They have no interline freight with vendors and not much with Quinn, the vendee, Brooks having received only some 80,000 pounds from the latter between January 1 and June 30, 1951. Complete data was not given with respect to the volume of New England tonnage which East Coast and Transfer interline. Out of more than three and one-half million pounds transported by Brooks to or from Richmond, on three days in 1951, only a little more than 100,000 pounds originated at or was destined to points in Connecticut, Massachusetts and Rhode Island. The bulk of vendee's tonnage originates in Massachusetts, and the opposing carriers have shared very little in the portion moving into vendors' territory.

The operating ratios of the first nine months of 1951 of East Coast and Transfer were slightly below 90, and that of Brooks was 95.1, the latter's ratio having improved by 1.5 over that of 1950.

The Commission found that while it is quite likely that Quinn, the vendee, being an aggressive carrier, will divert some freight from the opposing carriers, this fact alone is not sufficient reason for denying the application; and weighing the evidence on both sides the Commission stated it was not convinced that operations by Quinn, the vendee, under the unified rights would so hurt the opposing carriers as to impair their ability to continue performing their obligations as common carriers. Accordingly, the Commission found that the proposed transactions would be consistent with the public interest.

The opposing carriers also assert that the Commission was without statutory authority in granting temporary approval of Quinn's leasing the Neale operating rights without first giving notice to them, the opposing carriers, of the filing of the temporary authority application; and also that, in any event, the granting of such authority was unsupported by the evidence. Plaintiffs have put in evidence, in the present proceeding, a certified transcript of the entire proceedings, including all the evidence before the Commission.

We are thus presented with two major questions for decision: First, whether the Commission's orders approving the proposed purchases by Quinn from Neale and Wadkins are supported by adequate findings and substantial evidence; and (2) whether the Commission exceeded its statutory authority in granting temporary approval of Quinn's lease of the Neale operating rights because (a) notice was not first given to the plaintiffs and an opportunity afforded to oppose such approval; and (b) such approval, as it is claimed, was unsupported by the evidence.

■ Turning to the first of these questions, it involves the application of the rule of administrative finality, which is that if the Commission's order is based upon adequate findings which, in turn, are supported by substantial evidence, it cannot be dis-

564

turbed by a court on review, even though the court might consider the Commission's action wrong, and against the weight of the evidence. Interstate Commerce Commission v. Union Pacific R. Co., 222 U.S. 541, 32 S.Ct. 108, 56 L.Ed. 308. The Supreme Court has held that this rule has direct application to action by the Commission on an application, as here, under Section 5 of the Interstate Commerce Act. McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544; O. C. Wiley & Sons v. United States, 338 U.S. 902, 70 S.Ct. 308, 94 L.Ed. 554, affirming, per curiam, D.C., 85 F.Supp. 542. See also Virginia Stage Lines v. United States, D. C., 48 F.Supp. 79; Shein v. United States, D.C., 102 F.Supp. 320, affirmed per curiam, 343 U.S. 944, 72 S.Ct. 1043, 96 L.Ed. 1349. In the McLean Trucking Co. case, supra, the Court, in approving an order of the Commission authorizing the merger of several motor carriers under Section 5, said, 321 U.S. at pages 87–88, 64 S.Ct. at page 381: "* * * Resolving these considerations is a complex task which requires extensive facilities, expert judgment and considerable knowledge of the transportation industry. Congress left that task to the Commission 'to the end that the wisdom and experience of that Commission may be used not only in connection with this form of transportation, but in its coordination of all other forms.' 79 Cong.Rec. 12207. 'The wisdom and experience of that commission,' not of the courts, must determine whether the proposed consolidation is 'consistent with the public interest.' [Citing cases.] If the Commission did not exceed the statutory limits within which Congress confined its discretion and its findings are adequate and supported by evidence, it is not our function to upset its order."

■ The Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., has not altered the rule of administrative finality. Universal Camera Corporation v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

■■ Plaintiffs make the sweeping contention that the Commission's order of April 25, 1952, is "inconclusive of the issues, arbitrary, capricious, discriminatory, premature, contrary to provisions of law and the evidence, and unsupported by the evidence." But we find this contention to be wholly without merit. The Commission was required to make only two basic findings: (1) whether the proposed purchases by Quinn from Neale and Wadkins of their operating rights were within the scope of Section 5(2)(a) of the Act; and (2) whether these transactions would be consistent with the public interest. Alabama Great Southern Ry. Co. v. United States, 340 U.S. 216, 71 S.Ct. 264, 95 L.Ed. 225. We find that the Commission did make affirmative findings on both of these points, although the first is not in issue, since we do not understand that the plaintiffs question the Commission's authority under Section 5 to authorize transactions of this character. As to whether there is substantial support in the evidence for the finding that the transactions would be consistent with the public interest, there can be no doubt from an examination of the testimony as a whole. Detailed analysis of the evidence is believed to be unnecessary. Suffice it to point out, for example, that it stands without any proof to the contrary that of the freight interlined by Quinn with other carriers at Baltimore during the first half of 1951, an average of about 500,000 pounds weekly was interlined with Neale for further transportation to Washington, D. C., and points in Virginia which Neale was authorized to serve; that interchanging such traffic at Baltimore causes considerable delay in its delivery, requires the unloading and reloading of many shipments at Baltimore, involves six handlings of a less-than-truckload shipment moving from Boston to Washington, as against only four which a single-line movement would require, and that such extra handling frequently results in damage to shipments, and in loss and damage claims by Quinn against the interline carriers.

■ Another contention made by plaintiffs is that approval of the proposed transactions will enable Quinn to divert business from the plaintiffs which they now enjoy which would injure them and therefore would not be in the public interest. As to this, suffice it to say that it is not incon-

sistent with the public interest if, in order to provide the public with improved service, such would affect adversely the revenue of a protesting character. See Trans-American Freight Lines Inc.—Purchase—Harold D. Gorman, 5 M.C.C. 712; Super Service Motor Freight Co., Inc.—Purchase—Selman & Junkins, 45 M.C.C. 432; N. C. Purdie Corp.—Purchase—Hoffman's Motor Transportation, 57 M.C.C. 790. As heretofore emphasized, the question for this Court to decide is not whether, on like testimony this Court would have made a similar ruling, but simply whether the Commission's decision was based upon adequate findings, supported by substantial evidence, as to which the answer is clearly "yes".

Other points stressed by the plaintiffs are that the Commission failed to make any finding or conclusion with respect to the alleged dormancy of the Neale rights between Baltimore and Washington, and also as to whether Quinn had been engaging in unlawful operations between Baltimore and Washington, i.e., through unauthorized control by him of the operations of Neale from March 1950 to August 1951, and which plaintiffs claim, since such was the fact, required the Commission to deny the application for the purchase by Quinn. However, the Commission did make findings and conclusions on both of these points, as evidenced by the following quotation from pages 15 and 16 of its Report: "Traffic was interlined at Baltimore with vendee and other carriers. Vendee commenced interchanging with the administratrix in March of 1950, several months after executing the agreement to purchase the rights. According to an exhibit filed after the hearing, they interlined at Baltimore 416 shipments during the first six months of 1951, of which 366 consisted of paper moving from Lawrence, Mass., to Washington, 49 of skids from Washington to Lawrence, and 1 of oysters from Kilmarnock, Va., to Boston. Of the total shipments, 381 were transported from the point of origin to the point of destination in vendee's vehicles operated by its drivers. As to the remaining 35 shipments, the association's counsel, who examined the underlying data, assumes that the payments made by vendee to the administratrix were 'for the use of the Neale rights,' and not for actual transportation by the latter. It is clear that there was no genuine interchange in respect of the 381 shipments and that the arrangements between applicants were not consonant with the rules prescribed in Lease and Interchange of Vehicles by Motor Carriers, 52 M.C.C. 675. Moreover, such arrangements were initiated after the agreement to purchase. *The fact remains, however, that operations have at all times been actively and consistently conducted under Neale's certificate without regard to the above arrangements with vendee. The administratrix is unable to continue the operations because she has a young child and requires medical care, and the court having jurisdiction of the decedent's estate is pressing for settlement.*" (Emphasis supplied.)

In contending that, because of the finding of unlawful control, the Commission was bound to deny the application, plaintiffs' counsel relies upon the case of Kolowich—Control—Detroit and Cleveland Navigation Co.—Control—Denver—Chicago Trucking Company Inc., M.C.F. 4841, 9 Federal Carrier Cases 373. However, the facts there were distinctly different. Also, it is to be noted that the Commission said (p. 376): "We have frequently denied applications where the evidence showed that the parties had already effectuated control of the carriers involved in violation of Section 5. [Citation of cases omitted.] *It is true that we have stated that each such case must be determined on the basis of its own record, and we have granted the applications in some such cases on the ground that the public interest is paramount and that the applicants had clearly met their burden of proving that the control for the future would be consistent with the public interest.*" (Emphasis supplied.) The Commission then explained that, on the facts before it, the applicants had failed to establish affirmatively that the public interest would best be served by approval, and therefore the Commission refused to sanction the unlawful control.

The plaintiffs have raised several further points which they also claim are not sup-

ported by adequate findings and substantial evidence, but we do not understand they are seriously relied upon, and in any event we find the contentions made with respect to them not consonant with the actual findings of the Commission. Therefore, it is not believed necessary to consider these inconsequential points.

■ We come then to the second and final major contention of the plaintiffs, namely, that the Commission exceeded its statutory authority in granting temporary approval of Quinn's lease of the Neale operating rights, without first giving notice to the plaintiffs and an opportunity to object, and that in any event such approval was unsupported by the evidence.

The order in question of August 16, 1951, was issued by the Commission pursuant to Section 210a(b) of the Interstate Commerce Act, which provides that pending determination of a purchase application under Section 5 "the Commission may, *in its discretion,* and *without hearings or other proceedings,* grant temporary approval" for the operation by the proposed purchaser of the operating rights involved, "if it shall appear that failure to grant such temporary approval may result in destruction of or injury to such motor carrier properties sought to be acquired, or to interfere substantially with their future usefulness in the performance of adequate and continuous service to the public." (Emphasis supplied.) The order recited, as the reason for granting the approval that it appeared that failure to grant such temporary approval might result in destruction of or injury to the properties involved or interfere substantially with their future usefulness in the performance of adequate and continuous service to the public. These findings of fact have substantial support in the evidence before the Commission. See exhibit submitted with the application for temporary authority which was sworn to by both Thomas J. Lyons and Mrs. Agnes B. Neale. This exhibit states the facts upon which it appeared to the Commission that the temporary approval applied for should be granted, which, basically, are to the effect that since the death of Thomas F. Neale his widow had been endeavoring unsuccessfully, with no previous experience, to carry on her husband's trucking business under court jurisdiction, in consequence of which she had not been permitted to replace equipment or to use funds of her husband's estate to develop the business. There was also testimony in part to the same effect at the hearing conducted only a few days before the application for temporary authority was filed. From the aforegoing we are satisfied that the order giving approval of the lease was based upon legally adequate findings, and that these findings were supported by substantial evidence.

■ Lastly, the Commission was not required to give notice to the plaintiffs before granting the temporary approval. Under the Act, Section 210a(b), the Commission was authorized, "in its discretion, and without hearings or other proceedings," to act immediately on the application before it. The very purpose of this provision would be defeated if the Commission were required to postpone action upon such an application until the opposing parties could be notified and given an opportunity to submit their protests and offer contravening evidence. A mere notice of the application would be of no value to them unless they were permitted to be heard. See Alabama Great Southern Ry. Co. v. United States, D. C., 103 F.Supp. 223; Hudson River Day Line v. United States, D.C., 85 F.Supp. 225; Kansas City & Leavenworth Transportation Co. v. United States, D.C., 51 F. Supp. 916; Schenley Distillers' Corp. v. United States, D.C., 50 F.Supp. 491.

■ It is not true, as counsel for plaintiffs contend, that the Commission specifically undertook to give them notice of all future proceedings and to afford them a right to participate therein. It is appropriate to point out that even though the plaintiffs did not receive notice of the filing of the temporary authority application until after the Commission had entered its order approving it, the plaintiffs, did, on August 31, 1951, file with the Commission their petition for reconsideration and vacation of the order. To that petition the applicants filed their reply on September 12, 1951, and the Commission, after giving due consider-

567

ation to the representations of both sides, entered its order of November 5, 1951, denying the plaintiffs' petition. Thus it appears that the plaintiffs were afforded an opportunity to protest against the grant of temporary authority, that their protest was received and considered, and that the Commission nevertheless permitted its previous decision to stand.

For the aforegoing reasons the complaint will be dismissed.