SOUTHERN RAILWAY COMPANY,
Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission,
Defendants.

Civ. A. No. 2749.

United States District Court
E. D. Virginia,
Richmond Division.

Argued May 5, 1959.

Decided June 15, 1959.

Thomas B. Gay, Richmond, Va., Seddon G. Boxley, Washington, D. C., for plaintiff.

James Y. Piper, Asst. Gen. Counsel, and Robert W. Ginnane, Gen. Counsel, Washington, D. C., for defendant Interstate Commerce Commission.

E. Riggs McConnell, Atty., Dept. of Justice, Washington, D. C., and John M. Hollis, U. S. Atty., Norfolk, Va., for defendant the United States.

Richard B. Gwathmey, Wilmington, N. C., R. Granville Curry, Washington, D. C., Denny, Valentine & Davenport, Richmond, Va., for intervening defendants.

Before SOBELOFF, Chief Circuit Judge, and HUTCHESON and BRYAN, District Judges.

## SOBELOFF, Circuit Judge.

The Southern Railway Company asks this 3-Judge Court, convened pursuant to 28 U.S.C.A. §§ 1336, 2284, and 2321–2325, to set aside and enjoin enforcement of an order of the Interstate Commerce Commission granting the Spartanburg Terminal Company a certificate of public convenience and necessity for the construction and operation of a tunnel and trackage under Southern's tracks near its passenger station in Spartanburg, South Carolina.[1] Southern's complaint proceeds upon the ground that the Commission's ultimate conclusion of public convenience and necessity rests on certain secondary findings which are unsupported by "substantial evidence" in the record and are made without the "reasons or basis therefor," as required by the Administrative Procedure Act, 5 U.S.C.A. §§ 1009(e) and 1007(b).

The City of Spartanburg is an important railroad center. Bisecting the city is the main line of Southern, which maintains a passenger station near Magnolia Street. The Clinchfield Railroad Company ("Clinchfield") enters the city from the north; the Charleston and Western Carolina Railroad Company ("C & W") and the Piedmont and Northern Railway Company ("Piedmont") enter the city from the south. All three railroads terminate at Southern's tracks near the Magnolia Street station: Clinchfield on the north side, C & W and Piedmont on the south side. Since there is no direct connection between Clinchfield's line and those of C & W and Piedmont, the interchange of traffic between the latter two and Clinchfield is effected by Southern across its tracks at a per car switching charge.

By application filed May 10, 1954, before the Interstate Commerce Commission, the Spartanburg Terminal Company ("Terminal") sought a certificate of public convenience and necessity under § 1(18) of the Interstate Commerce Act, 49 U.S.C.A. § 1(18), to construct a connecting track between the lines of Clinchfield and C & W. Terminal, Clinchfield and C & W are affiliated companies, sometimes referred to in the Commission's Report as the "Coast Line Interests." Terminal proposed to run the connecting track, which is less than one mile in length, through a tunnel to be constructed four and one half feet below Southern's tracks near the Magnolia Street station.

Southern objected that a tunnel at that location would prevent it from lowering the grade of its own tracks 10 feet. Southern explained that such grade reduction would enable it to increase its tonnage per train by 500 tons, and eliminate a number of trains at an annual saving of approximately $70,000.

Piedmont filed a separate application[2] with the Commission, proposing to build a connecting track with Clinchfield in substantially the same location as that proposed by Terminal but at a level five

---

1. Spartanburg Terminal Company Construction, Finance Docket No. 18534, July 10, 1957.

2. Piedmont & Northern Railway Company Construction, Finance Docket No. 19095.

feet lower, or 9½ feet below Southern's tracks. Subsequently, Terminal agreed to grant Piedmont trackage rights over the proposed connection to Clinchfield and C & W if the Commission would issue the desired certificate to Terminal.

After a lengthy consolidated hearing upon both applications, covering 1100 pages of testimony, Division 4 of the Commission issued a certificate of public convenience and necessity authorizing Terminal to construct its connecting track but at the level proposed by Piedmont, i. e., 9½ (instead of 4½) feet below Southern's tracks, and subject to Piedmont's trackage rights as mentioned above. Southern's petition for reconsideration was denied by the full Commission.

In determining public convenience and necessity, the Commission stated:

"We are convinced by the record that construction of a tunnel at the level proposed by the Piedmont is feasible; that the benefits to be derived therefrom would more than justify its cost; and that the resulting damages to the Southern, if any, would not be unreasonable."

It is these secondary findings which Southern challenges as "unsupported by substantial evidence," contrary to § 10(e) of the Administrative Procedure Act, and are not accompanied by "the·reasons or basis therefor," as required by § 8(b) of the Act.

The leading case interpreting the "substantial evidence" test of the Administrative Procedure Act is Universal Camera Corp. v. National Labor Relations Bd., 1951, 340 U.S. 474, 488, 71 S. Ct. 456, 465, 95 L.Ed. 456. It is there held that an administrative decision will be upheld if "the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes"; and a reviewing court may not displace the agency's "choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*."

■ The Commission's decision, we are convinced, meets this requirement. Feasibility, tested by engineering, fiscal and operating standards, was shown by numerous witnesses. In addition to the testimony of engineers, there was evidence that each year more than 174,000 cars are interchanged by Southern between Clinchfield on the one hand and C & W and Piedmont on the other; that in performing this service Southern is required many times to cross Magnolia Street, a busy thoroughfare in the heart of the city; that this involves serious traffic hazards; that the time consumed in the interchange service ranges from 70 minutes to two hours, and in some instances up to 3½ hours, in contrast to the 30 minutes that would be required by the direct connection through the proposed tunnel; and that the present cost of $4.61 for switching each loaded car, now paid to Southern, would be reduced to $1.67.

■ All of this evidence was referred to by the Commission in its Report, and patently this is the evidence upon which the Commission based its finding of feasibility and benefits. The requirement in § 8(b) of the Administrative Procedure Act that administrative decisions shall contain findings "as well as the reasons or basis therefor" does not necessitate detailed findings of every subsidiary evidentiary fact; § 8(b) is satisfied when the agency makes clear the factual basis upon which it has proceeded. Coyle Lines v. United States, D.C.E.D.La.1953, 115 F.Supp. 272, 276; Capital Transit Co. v. United States, D.C.D.C.1951, 97 F.Supp. 614, 621; Baltimore Transfer Co. v. Interstate Commerce Comm., D.C.D.Md.1953, 114 F.Supp. 558, 564, affirmed per curiam, 1953, 346 U.S. 890, 74 S.Ct. 225, 98 L.Ed. 394; Cf. Alabama Great Southern R. Co. v. United States, 1951, 340 U.S. 216, 228, 71 S.Ct. 264, 95 L.Ed. 225. This the Commission has done.

· ■ Parenthetically, Southern objects to the Commission's reliance on allegedly "stale" evidence relating to delays in the interchange service, since that per-

tained to the year 1954 and earlier, while the Commission's Report was not rendered until 1957. Southern's evidence was that in the last month of 1954 there were no undue delays in the switching operations. However, this only affects the weight of the applicants' evidence, which is in the province of the Commission. Moreover, Southern has never denied the need for a direct connection, but has objected only to its location. The allegation of "stale" records has been upheld by the Supreme Court only once. Atchison, T. & S. F. R. Co. v. United States, 1932, 284 U.S. 248, 52 S.Ct. 146, 76 L. Ed. 273, but the Court "promptly restricted that decision to its special facts [pronounced reduction in the railroads' earnings caused by the Depression] * * * and it stands virtually alone." Interstate Commerce Commission v. City of Jersey City, 1944, 322 U.S. 503, 515, 64 S.Ct. 1129, 1135, 88 L.Ed. 1420. The statistics for a single month, which the Commission had before it, are not shown to be of overwhelming significance. Southern has not attempted to show, as was done in Atchison, T. & S. F. R. Co. v. United States, supra, that any "radically different" situation had arisen after the Commission hearing.

Southern assails, furthermore, the Commission's determination that the benefits to be derived from constructing the tunnel at the lower level would more than justify its cost, estimated at $1,500,-000 exclusive of the cost of purchasing the necessary right-of-way. The construction cost of the tunnel proposed by Terminal at the higher level, 4½ feet under Southern's tracks, was estimated at $1,000,000. The Commission held the increased construction cost at the lower level justified, reasoning that since the easement cost would be less than at Terminal's proposed level, the aggregate cost of construction and easement in the two projects would tend to be equalized. Southern attacks this as error, contending that the record is devoid of any evidence as to cost of the easement, and that if the Commission had not proceeded on this erroneous premise, it would not have

approved the more expensive tunnel. However, in view of the finding of the obvious and compelling public benefits expected to flow from the tunnel construction, it is doubtful that the Commission would reach a contrary result even if the construction costs of a tunnel at the lower level would be somewhat greater. Moreover, when no objection is made by Terminal and Piedmont, who are to bear these added costs, it is anomalous for Southern to take issue on this ground. The Commission's Report points out that at the hearing Southern proposed a plan for an alternative location for the tunnel which would have required a longer route and entailed construction and easement costs still higher than those involved in the project approved by the Commission.

The record testimony and the Commission's findings based thereon, which we have discussed up to this point would be sufficient to sustain the issuance of the certificate of public convenience and necessity. However, the Commission proceeded further and gave consideration to the other side of the coin, i.e., the economic effect of the tunnel construction on Southern itself. The Commission found that the "resulting damages to the Southern, if any, would not be unreasonable."

This finding, Southern contends, is unsupported by the evidence. Southern's witnesses testified that it planned to lower the grade of its tracks 10 feet so as to enable its freight cars to carry more tonnage at an annual saving of $70,000, but that construction of the tunnel by Terminal would frustrate Southern's plans by limiting the possible grade-lowering to 6½ feet. It is argued to us that the Commission erroneously assumed that Southern would still proceed with its grading plan and depress the track level by the 6½ feet, and upon this assumption concluded that Southern's damages "would not be unreasonable." Southern then exposes the fallacy of the reasoning it thus attributes to the Commission. It contends that a 6½ foot grade reduction would permit too limit-

ed an increase in tonnage to warrant the cost involved; that any grade reduction to be worthwhile would have to be the full ten feet; and, therefore, by effectually preventing any grade reduction the resulting damages to Southern would necessarily be unreasonable.

While it is true that in the course of its Report the Commission does deal with the contingency that the tunnel would permit grade reduction by Southern of only 6½ feet, it also had before it expert testimony that notwithstanding the tunnel Southern would be able to lower its grade 9½ feet.

■ The failure to specify whether the finding of no unreasonable damage was upon the premise that the tunnel would allow Southern to lower its tracks 6½ feet or 9½ feet is not a material defect, if defect it be. From the context it is obvious that the Commission would not be controlled by this factor in its judgment of public convenience and necessity or reasonableness of the damage to Southern since, as the Commission specifically declared, Southern would be compensated for any interference with its grade-reduction plan when the land needed for the tunnel construction, which is owned by Southern, is purchased or condemned.

■ Southern assails this statement, asserting that the record fails to disclose any evidence that it would be compensated for the value of the land taken and for the loss of its right to lower the tracks on Magnolia Street at some future time. The right to compensation has a constitutional and statutory basis for which no evidence is required. In South Carolina, as in most states, the compensation to be paid for taking of land is determined not only by the existing use of the land but also by its potential value stemming from contemplated uses in the future. City of Orangeburg v. Buford, Belk-Hudson, 1955, 227 S.C. 280, 87 S.E.2d 822. Consequently, whether the tunnel would or would not interfere with Southern's grade-revision plan, in either event, appropriate compensatory damages would be recoverable. It is in this light that the Commission concluded that the "resulting damages to the Southern, if any, would not be unreasonable."

■ The "damages" discussed in the Report and by counsel do not, of course, relate to loss of revenue which Southern will sustain if its switching service is no longer required. No relief has been, nor could it have been, sought from this court on the ground that one result of the project is that the Coast Line Interests and Piedmont will gain advantage at the expense of Southern's revenues. As Judge Dobie said in Seaboard Air Line Railroad Co. v. United States, D.C. E.D.Va.1954, 131 F.Supp. 129, 136, affirmed 1955, 349 U.S. 902, 75 S.Ct. 579, 99 L.Ed. 1239: "The mere fact that an order of the Commission adversely affects the economic interest of a carrier is, of course, no ground for denying the validity of the order."

Tending to support the finding of no unreasonable damages is the Commisson's appraisal of Southern's plan to change its grade as, at most, vague and indefinite. A witness for Southern testified that he had been informed by one of the company's officers that the grade would be lowered. Southern introduced no blueprints of the purported plan. Nor were any estimates of costs offered; indeed, it was not suggested that the company had explored the matter to this degree. Significantly, the Commission alluded to testimony of engineering experts that, insofar as any grade-correction is concerned, sound engineering principles would require Southern's tracks at Magnolia Street to be *raised* rather than lowered. The engineers pointed out that the tracks could not be lowered without a major reconstruction of the passenger station, freight yard and grade crossings at an estimated expense of over two million dollars, while elevating the tracks and the approaches to Magnolia Street would not entail such extensive reconstruction and would accomplish the desired grade-leveling more cheaply. The Commission comments, "It is doubtful that a saving of only $70,-

000.00 a year in operating expenses would justify an undertaking of this magnitude [at a cost of $2,000,000]. However, that matter is for the Southern to decide."

■ We conclude that the question of damages is of inferior importance in the present proceeding. This is not a condemnation case, where greater precision would be essential in ascertaining damage. Specific findings by the Commission as to this were not crucial, for an exact determination of damages was not necessary in reaching the conclusion as to public convenience and necessity.

■ The Congressional purpose in enacting the Administrative Procedure Act was not to exact a form of literary exercise from administrative bodies, but to insist on sufficient disclosure; and where the subsidiary findings are shown to have substantial support in the evidence and provide a rational basis for the Commission's determination of public convenience and necessity, this is enough. The term "public convenience and necessity" is not defined in the statute, and in its application the Commission is given a "wide range of discretionary authority." United States v. Detroit & Cleveland Navigation Co., 1945, 326 U.S. 236, 241, 66 S.Ct. 75, 77, 90 L.Ed. 38. We do not have here the situation described in Chesapeake Motor Lines, Inc. v. United States, D.C.D.Md. 1957, 153 F.Supp. 812, of a regulatory body merely turning "thumbs up" or "thumbs down" without adequate explanation. Action taken without fair exposition of the grounds is not immune to judicial scrutiny, but when the Commission's report fairly and understandably sets forth the basis of its conclusions and the reasoning upon which it proceeded, minor deficiencies in form should not invalidate its order.

After careful consideration of each of the defects ascribed to the Commission's Report and upon the record as a whole, we cannot conscientiously say that there is room for serious doubt as to the basis upon which the Commission acted or that its conclusions are so lacking in ration-

ality as to warrant judicial interference. We reject the claim of non-compliance with the prescribed standards of the Administrative Procedure Act.

The Commission's order granting the certificate of public convenience and necessity is warranted by the law and the facts, and the injunctive relief sought must be denied.

Action dismissed.