CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY, Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

No. 62 C 260.

United States District Court
N. D. Illinois, E. D.

May 2, 1962.

Thomas I. Megan, Donald C. McDevitt, Theodore E. Desch, Martin L. Cassell, Chicago, Ill., for Chicago, R. I. & P. R. Co., plaintiff.

Lee Loevinger, Asst. Atty. Gen., John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., James P. O'Brien, U. S. Atty., John P. Crowley, Asst. U. S. Atty., Chicago, Ill., for United States.

Robert W. Ginnane, Gen. Counsel, Leonard S. Goodman, Atty., Interstate Commerce Commission, Washington, D. C., for Interstate Commerce Commission, defendant.

Carl McGowan, Edgar Vanneman, Jr., John C. Danielson, Chicago, Ill., for Chicago & N. W. Ry. Co., intervening defendant.

Michael L. Weissman (of Antonow & Fink), Chicago, Ill., Arthur L. Winn, Jr., Samuel H. Moerman, J. Raymond Clark, James M. Henderson (of LaRoe, Winn & Moerman), Washington, D. C., for International Paper Co., intervening defendant.

Mishael O. Gard (of Swain, Johnson & Gard), Peoria, Ill., for Pioneer Industrial Park, Investors Enterprises, Inc., and Peoria Industrial Enterprises, Inc., intervening defendants.

Before KNOCH, Circuit Judge, and HOFFMAN and PARSONS, District Judges.

PARSONS, District Judge.

Pioneer Industrial Park, a 340 acre plot of undeveloped farm land situated northwest of Peoria, Illinois, was purchased by the Peoria Industrial Enterprises, Inc., and dedicated by it in September of 1959 for the purpose of attracting new industry to the vicinity of Peoria. Thus far, three businesses have built plants within the Park. In the southeast portion of the Park is the new plant of the C. A. Reed Company. Southwest of the center of the Park lies the new warehouse of the Super-Valu Company. Immediately north of Super-Valu has been built the new plant of the International Paper Company for its Muirson Label Division in the Midwest.

The Park is intersected on the east by a branch line of the Rock Island and Pacific Railroad Company extending from Peoria in a northwesterly direction. During 1960, the Rock Island commenced operations serving the C. A. Reed and Super-Valu Companies. Approximately 1.3 miles west of the Park runs the double track, East St. Louis Chicago main line of the Chicago and North Western Railroad.

Before building in the Park, the International Paper Company approached North Western concerning rail service, and the plant was built with its loading facilities arranged to accommodate a railroad siding from the North Western line. It was the attempt by North Western to begin construction of trackage from Radnor, a junction on its road, to the Muirson Plant that gave rise to this litigation. The proposed trackage is 10,095 feet in length. Six thousand eight hundred and eighty-six (6,886) feet would extend from the switch at Radnor to the boundary of the Park. An additional 2,214 feet would extend within the Park to the Muirson Plant. The estimated cost is $231,900. All but $28,090 of this expenditure already has been made.

In November 1960, Rock Island petitioned the United States District Court for the Southern District of Illinois, Northern Division, to enjoin North Western's construction of the line. The question was whether or not the tracks to be built by North Western were an "extension of its line" or a "spur or industrial track". If it was an "extension of a line", it would be unlawful under 49 U.S.C.A. § 1(18) until North Western had obtained a certificate of convenience and necessity from the Interstate Commerce Commission. On November 15, 1960, the District Court for the Southern District of Illinois found that the trackage constituted an "extension of a line" within the meaning of Paragraph 18, and that construction of the trackage was unlawful until North Western had received the Commission's cer-

tificate of convenience and necessity. Chicago Rock Island and Pacific Railroad Company v. Chicago and North Western Railway Company, 188 F.Supp. 549 (D.C. Ill.1960).

Subsequently, by application filed December 2, 1960, North Western sought the necessary certificate from the Commission. After a hearing before an examiner on February 8 and 9, 1961, the Commission, on September 21, 1961, entered its report and order granting the certificate of public convenience and necessity to the North Western Road. On November 1, 1961, Rock Island petitioned the Commission to reconsider its order, but the Commission denied the petition.

On January 26, 1962, Rock Island filed a complaint in this Court under 28 U.S.C. §§ 1336, 1398, 2284 and 2321–2325, asking for a three judge court to enjoin and set aside the certification, and alleging that the Commission in granting the application contravened the legislative purpose of Section 1, Paragraph 18, of the Interstate Commerce Act, contravened the National Transportation Policy as set forth immediately preceding that Act, misapplied the law, and ignored judicial and commission precedent.

North Western, the International Paper Company and the Pioneer Industrial Park all intervened. (Rule 24[a] of the Federal Rules of Civil Procedure), 28 U.S.C.A. On January 31, 1962, a temporary restraining order was issued by this Court, the record and briefs were filed, and the matter was argued on April 11, 1962.

The principal question for determination at this time is whether the finding and conclusion of the Interstate Commerce Commission, that public convenience and necessity warrant the proposed extension of the line, was adequately supported by findings based on substantial evidence in the record.

Section 10(e) of the Administrative Procedure Act, 5 U.S.C.A. § 1009, reads as follows:

"(e) *Scope of Review*—So far as necessary to decision and where presented the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of any agency action. It shall (A) compel agency action unlawfully withheld or unreasonably delayed; and (B) hold unlawful and set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; (5) unsupported by substantial evidence in any case subject to the requirements of sections 7 and 8 or otherwise reviewed on the record of an agency hearing provided by statute; or (6) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error."

Defendants contend that the scope of judicial review is limited to an examination of the evidence supporting the conclusion reached by the Commission. For example, defendants, United States of America and Interstate Commerce Commission, cite the fifty-year old case, Interstate Commerce Commission v. Union Pacific Railroad Company, 222 U.S. 541, 32 S.Ct. 108, 56 L.Ed. 308 (1912), which held that "the courts will not examine the facts further than to determine whether there was substantial evidence to sustain the order". Other cases cited in defendants' briefs lend support to this restrictive view of the Court's power of review. It is true that prior to 1951, the Courts held that in order to determine if there was substantial evidence supporting the

agency's decision, a district court need read only the side of the case for which the Commission had ruled, and, if it found any evidence there, the administrative action would be sustained. The record to the contrary would be ignored. (Report of the Attorney General's Committee 210–211).

▉ Dissatisfaction with this restricted scope of review led to the enactment of the Administrative Procedure Act and the 1947 amendments to the Labor Relations Act. Those statutes contain an express direction to reviewing courts to consider the "whole" record in reaching a determination of whether administrative findings have the required substantial evidentiary support. Despite this, many courts held for several years subsequent to 1947 that the scope of review remained substantially what it had been before the enactment of the two statutes. (See observation in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474 at 476, note 1, 71 S.Ct. 456, 95 L.Ed. 456). Still others, while acknowledging the new rule, limited their review to the scope of the old. In 1951, however, the Supreme Court, in two opinions, Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) and National Labor Relations Board v. Pittsburgh S. S. Co., 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479 (1951), unanimously upheld the Court of Appeals for the Sixth Circuit, which had held that the courts' reviewing power had been materially broadened by the Administrative Procedure Act and the 1947 amendments to the Wagner Act. Pittsburgh S. S. Co. v. National Labor Relations Board, 180 F.2d 731 (6th Cir.1950). The new breadth of our reviewing responsibility has been brought about by the insertion in both statutes of the specific direction to reviewing courts that we base our decisions upon a review of the "whole record". (See A Decade of Administrative Law, Bernard Schwartz, Mich.Law Rev., April, 1953, Vol. 51, No. 6).

In the Universal Camera case, supra, the Court stated at pages 487, 488, 71 S.Ct. 456:

"Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitely precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record. Committee reports and the adoption in the Administrative Procedure Act of the minority views of the Attorney General's Committee demonstrate that to enjoin such a duty on the reviewing court was one of the important purposes of the movement which eventuated in that enactment."

▉ Section 1(18) of the Commerce Act provides that before a carrier by railroad undertakes the construction of an extension of its line, it must obtain from the Commission a certificate that the present or future public convenience and necessity require or will require the extension. The underlying purposes of this section are: (1) to prevent improvident and unnecessary expenditures for the construction and operation of lines not needed to insure adequate service; (2) to protect interstate carriers from weakening themselves by constructing and operating superfluous lines; (3) to protect interstate carriers from being weakened by another carrier operating in interstate commerce, a competing line not required in the public interest; and (4) to preserve well balanced competition. Union Pacific Railroad Company v. Denver and Rio Grande Western Railroad Company, 198 F.2d 854, 858 (10th Cir.1952). But the words "public con-

venience and necessity" are not defined, and so the courts have allowed the Commission a wide range of discretion in determining their meaning. Southern Railway Company v. United States, 180 F.Supp. 189 (D.C.Va.1959). The Commission on occasions has stated that justification for the construction of an extension of a line must reflect by clear proof a strong or urgent need for such line. Galesburg & G. E. R. Company Construction, 244 I.C.C. 470, 477 (1941).

■ ■ Much of defendants' arguments have been devoted to the proposition that North Western service is necessary to meet the requirements of the Muirson Plant. Although the interests of a single shipper may be matters of substantial importance in determining the question of public convenience and necessity, nevertheless, the interests and desires of one entity alone may be insufficient to establish a "public" need. Chesapeake and Ohio Railway Company Construction, 267 I.C.C. 665 (1947). There are many instances in which one industry in an area would reflect the interests of the public, as far as shippers are concerned, even though other industries were present, but the needs of a single plant in an area of expanding and diversified industrialization usually do not suffice alone as evidence of public convenience and necessity. Texas and Pacific Ry. v. Gulf C. & S. F. Ry. Co., 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578 (1926); Northern Pacific Ry. Co. Construction, 295 I.C.C. 281 (1956). When the statute refers to public convenience and necessity, it does not mean any one person that may be benefited at a particular locality, but it means the public generally, even though that public may be seen only through a single person, and in determining the true public convenience the effect of the order upon such whole public must be taken into account.

■ In determining whether there is substantial evidence relating to public convenience and necessity to support the Commission's findings and decision, we must carefully examine all of the evidence presented to the Commission.

North Western presented to the Commission, the following evidence: (1) testimony by an Olaf N. Rye, General Traffic Manager of International Paper Company, that North Western service was necessary to meet the requirements of the Muirson Plant, and that the Plant would not have been constructed at its present location if North Western service were not available; (2) testimony by Rye that since Muirson gets most of its raw materials from the South, it should be served by a railroad that directly serves the St. Louis Gateway, that North Western can provide fast main line service from St. Louis, whereas the Rock Island can serve only as a switching carrier from Peoria after other carriers have brought the supplies to that point, and that Rock Island's service would result in serious delays; (3) testimony by Rye that according to his experience, reliable service is usually forthcoming when a plant is situated along a main line, that if the Muirson Plant were dependent on Rock Island's branch line, the problem of getting DF equipment or good box cars would be serious, and would necessitate the utilization by the Muirson Plant of costly truck service; (4) testimony that the Muirson Plant was already constructed to receive North Western service; (5) testimony by an expert witness, a graduate engineer who had been in the Engineering Department of North Western Railway Company for some time before moving to its Industrial Development Department, that the Rock Island would require a switchback operation to get into the Muirson Plant, and that the Rock Island operation would be more expensive because of the extra moves required by this special switchback; (6) testimony that an extension of Rock Island's Super-Valu track to the Muirson Plant would be economically prohibitive; (7) testimony that North Western has three trains daily running in each direction on its main line, that it can furnish extra service as required, and

that its main line is equipped with 115 pound rail with double tracks in the vicinity, permitting a speed limit of 45 M.P.H., as against the Rock Island line 80 pound rail upon which the speed limit is 20 M.P.H.; (8) testimony that Rock Island's switching operation would normally consume at least one day more than North Western's operation; and (9) general approval testimony from a number of witnesses that the service of North Western was necessary to encourage the development of an increased diversification of industry in the Park, and that certain business interests would not locate in the Park if only Rock Island service would remain available.

Rock Island, on the other hand, took the position that the application of North Western was inimical to the national interest, wasteful of North Western's own resources, and injurious to Rock Island. It contended that there was no strong and urgent public need for the proposed trackage and that Rock Island was able and willing to provide adequate service to the Muirson Plant. In support of this position, Rock Island presented the following evidence: (1) testimony that the Park is within the switching limits of the City of Peoria on the Rock Island, that the Rock Island presently serves the area by two regularly assigned switch engines on duty sixteen hours daily, and that the other eight hours of the day can be served by a switch engine presently available for emergencies; (2) testimony by the customers of Rock Island that its service in the Park has been satisfactory; (3) testimony that if the track is built by North Western, the Rock Island line will lose a great amount of profit; and (4) evidence that the Rock Island line is only .3 of a mile from the Muirson Plant, whereas the Radnor Junction is over 2 miles away from the Plant.

It is apparent from the record that the Commission was particularly impressed by the fact that a proposal to build the trackage in question was made only to North Western and not to the plaintiff. In its evaluation of the evidence before it the Commission said:

"From the evidence submitted, it is apparent that Rock Island has not been requested to furnish service, has no assurance that its service would be accepted, and could not supply the satisfactory service with regard to shipper requirements to the same extent as could applicant. In view of the unrefuted evidence concerning the Rock Island's limited access into the new plant (either by construction of the cut previously described or by a switch-back movement) and the method of switching in the Peoria yards, we conclude that the intervenor's operation would not be adequate, efficient or economical in the light of applicant's proposal herein. Nor will applicant's entry into the area adversely affect Rock Island's presently established operation."

It is very possible that the Court would have decided this case differently had the matter been before it *de novo*. As a result of the almost limitless diversification of interests represented in the many different cases unfolded before them daily, courts are less likely to be motivated by the prearranged plans and special needs of a single corporation in a park that is dedicated to attracting a diversification of industry, as reflecting "public necessity and convenience", than are commissions. However, because the Commission is one of those agencies presumably equipped or informed by experience to deal with a specialized field, it can provide an insight of inestimable worth in evaluating evidence in this area. The Court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is thus one of reasonableness, not rightness. It therefore is not the role of this Court to consider the record before the Commission by a standard different to that

**384**

of the Commission, but rather to measure with the Commission's standard the evidence upon the basis of the rule that the determination be reasonable and be supported by substantial evidence.

Upon examination of the entire record, the Court finds that it was shown to the Commission that North Western can offer a fast main line service from the St. Louis Gateway to Radnor, Illinois. It was also shown to the Commission that North Western provides single line service to a large portion of the Mid-western market. It presently operates three freight trains daily over its line and has offered to stop any or all of them at Radnor and have the road engine set out or pick up cars as required. Such service will by-pass the yards at Peoria, eliminate the switching at that point, and save as much as a day's time in the handling of cars. It was shown to the Commission that Rock Island can provide only a switching carrier on inbound shipments entering the Peoria area and bound for the Park. In this respect, Rock Island would receive the inbound cars only after they had been brought from the St. Louis Gateway to Peoria by a line-haul carrier and proceeded through a switching operation by either the Peoria and Pekin Union Railway Company or the Toledo, Peoria & Western Railroad Company to Rock Island's yards. A similar movement in reverse order would be required for outbound shipments. The most important evidence is that found in the testimony of a number of witnesses, which indicates that the superior service of North Western will not only meet the needs and the convenience of the Muirson Paper Plant, but will fill the same general need existing in the Park as a whole for encouragement in its program of developing diversified industry.

The Court thus finds that the Commission's findings were reasonable and supported by substantial evidence. Therefore, the temporary restraining order issued on January 31, 1962, will be, and hereby is, vacated, the plaintiff's motion for a permanent injunction is denied, and the complaint is dismissed.