**BOSTON AND MAINE RAILROAD**
and
The New York, New Haven and Hartford
Railroad Company, Plaintiffs,

v.

**UNITED STATES of America**
and
Interstate Commerce Commission,
Defendants.

Civ. A. No. 61–38–S.

United States District Court
D. Massachusetts.

Feb. 16, 1962.

Robert G. Bleakney, Jr., Neal Holland,
Henry E. Foley, Foley, Hoag & Eliot,
Boston, Mass., James W. Grady, Thomas

P. Hackett, New Haven, Conn., for plaintiff.

Robert W. Ginnane, Gen. Counsel, I. K. Hay, Associate Gen. Counsel, Interstate Commerce Commission, Washington, D. C., W. Arthur Garrity, Jr., U. S. Atty., James Noonan, Asst. U. S. Atty., John H. D. Wigger, Lee Loevinger, Dept. of Justice, Washington, D. C., for defendant.

Walter J. Myskowski, LaRoe, Winn & Moerman, Washington, D. C., Richard J. Ferriter, Charles M. Ewing, Boston, Mass., Morris Duane, Duane, Morris & Heckscher, Philadelphia, Pa., Bruce A. Wallace, Camden, N. J., Francis W. Sullivan, Philadelphia, Pa., Warren Price, Jr., Washington, D. C., Theodore Chase, Palmer, Dodge, Gardner & Bradford, Boston, Mass., Jervis Langdon, Jr., Baltimore, Md., Charles R. Seal, Norfolk, Va., Charles E. Holly, Boston, Mass., David Berger, Lewis Kates, Philadelphia, Pa., Herbert B. Erhmann, Raya S. Dreben, Boston, Mass., William L. Marbury, Baltimore, Md., Donald Macleay, Washington, D. C., J. Cookman Boyd, Jr., Karl J. Grimm, Baltimore, Md., A. M. Knowles, Scott W. Scully, Portland, Me., Arthur L. Winn, Jr., Samuel H. Moerman, James M. Henderson, Washington, D. C., Charles W. Merritt, New York City, Richard R. Bongartz, Philadelphia, Pa., John F. Reilly, Richard E. Costello, New York City, J. W. G. MacDougall, Montreal, Canada, John H. Colgren, New York City, Raymond W. Troy, Lum, Biunno & Tompkins, Newark, N. J., Louis J. Lefkowitz, Paxton Blair, Dunton F. Tynan, J. Bruce MacDonald, Albany, N. Y., Sidney Goldstein, F. A. Mulhern, Leo A. Larkin, Charles H. Tenney, Samuel Mandell, Sidney Brandes, New York City, John H. Lewin, Baltimore, Md., William C. Burt, Robert M. Beckman, Koteen & Burt, Washington, D. C., John W. Hanifin, Richmond, Va., Robert B. Claytor, Roanoke, Va., Martin A. Meyer, Jr., Washington, D. C., William P. Quinn, Philadelphia, Pa., William C. Purnell, John Martin Jones, Jr., Charles J. Henry, Jr., Baltimore, Md., for intervenors.

Before WOODBURY, Circuit Judge, and SWEENEY and FORD, District Judges.

SWEENEY, Chief Judge.

The plaintiffs—Boston and Maine Railroad and The New York, New Haven and Hartford Railroad Company—brought this action pursuant to 28 U.S.C. §§ 1336, 2284, 2321 and 2325, to set aside and enjoin enforcement of an order of the Interstate Commerce Commission, Investigation and Suspension Docket No. 6615, Equalization of Rates at North Atlantic Ports, 311 I.C.C. 689, denying a fourth-section application and cancelling new rate schedules filed by the plaintiffs and their connecting carriers,[1] in which they proposed to reduce rates on export and import traffic[2] between the ports of New York and Albany, New York, Boston, Massachusetts, and Portland, Maine, hereinafter referred to as northern tier ports, on one hand, and affected territory[3] on the other. The proposal was designed to place on a parity the rates on this traffic through these ports with rates on like traffic through the southern tier ports.

The original defendants are the United States and the I. C. C. Other railroads

---

1. The Delaware and Hudson Railroad Corporation, Erie-Lackawanna Railroad Company, Grand Trunk Railway System-Lines East, The New York Central Railroad Company, New York, Susquehanna and Western Railroad Company.

2. Except iron ore, coal, and coke which is a direct product of coal.

3. It includes territory on and west of a line extending from a point just west of Buffalo through Warren, Oil City, Butler, Pittsburgh, and Washington, Pa., Wheeling, W. Va., thence along the east bank of the Ohio River to Kenova, W. Va., including points in West Virginia, Charleston and west thereof, certain points in Kentucky on the lines of The Chesapeake and Ohio Railway Company, and points on the south bank of the Ohio River from Huntington, W. Va., to Cincinnati, Ohio.

and various port and commercial interests have intervened on both sides.[4]

The differences in existing rail rates on import and export traffic are shown below.

| Port | Differentials, in cents per 100 pounds | | | | | |
|---|---|---|---|---|---|---|
| | Classes | | | | | |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| *Import traffic* | | | | | | |
| Canadian ports (same as Baltimore) ............... | | | | | | |
| Portland (Baltimore rates via Canadian routes; New York rates via standard routes) ..... | | | | | | |
| Boston (same as New York) ..... | | | | | | |
| Albany (Philadelphia rates, subject to domestic rates as maxima) ............... | | | | | | |
| Philadelphia under New York .. | 6 | 6 | 2 | 2 | 2 | 2 |
| Baltimore under New York .... | 8 | 8 | 3 | 3 | 3 | 3 |
| Hampton Roads [1] (same as Baltimore) ............... | | | | | | |
| *Export traffic* | | | | | | |
| Canadian ports: | | | | | | |
| Halifax, St. John, et cetera (same as New York) ..... | | | | | | |
| Montreal (same as Philadelphia) ............... | | | | | | |
| Portland ............... | | | | | | |
| Boston (same as New York) ..... | | | | | | |
| Albany (Philadelphia rates, subject to domestic rates as maxima) ............... | | | | | | |
| Philadelphia under New York: Grain, 0.5 cent under N.Y. .. Flour, 1 cent under N.Y. .... | 2 | 2 | 2 | 2 | 2 | 2 |
| Baltimore under New York: Grain, 1.5 cents under N.Y. .. Flour, 2 cents under N.Y. .. | 3 | 3 | 3 | 3 | 3 | 3 |
| Hampton Roads [2] (same as Baltimore) ............... | | | | | | |

1. To territory west of the Sandusky, Mansfield, Zanesville, Marietta line.

2. From territory west of the Sandusky, Mansfield, Zanesville, Marietta line.

4. The intervening plaintiffs include the Massachusetts Port Authority; the Port of New York Authority; the State of New York; the City of New York; Brooklyn Chamber of Commerce, Inc.; Belleville Manufacturers' Association;

The differentials were the result of an agreement entered into by North Atlantic port railroads in 1877. At that time ocean rates to Philadelphia and Baltimore were higher than to the northern tier ports and the object of the agreement was "to avoid misunderstanding as to the geographical advantages or disadvantages of New York, Philadelphia, and Baltimore as affected by railroad-ocean transportation, and to effect an equalization of rail-ocean transportation cost between interior points and foreign ports reached through these cities." Boston rates, under this agreement, were to be no less than those to and from New York.

Beginning in the early 1920's and extending to about 1935, ocean rates to and from the different ports gradually were equalized and the total transportation charge through the northern tier ports consequently became higher than the combined cost of rail and ocean transportation through a southern tier port. It is this competitive disadvantage which the plaintiff railroads sought to remove with their proposed rate schedule.

By schedules filed to become effective simultaneously with those of plaintiffs, certain railroads which serve the southern tier ports and, in some instances, also New York, proposed to reduce their rates by the same amounts. This counterproposal, which was to take effect only if the plaintiffs' schedules were allowed, would restore the differential at a lower level.

Upon protests of each group to the other proposal, the I.C.C. suspended both schedules and instituted an investigation into their lawfulness. After hearing and review by the Commission, it issued the order from which this appeal was taken, denying the fourth-section application and cancelling the plaintiffs' proposed schedule on the findings that the "proposed rates are not shown to be reasonably related to the present rates on like traffic between the same interior points and the southern tier ports"; that they "would result in undue preference of and advantage to the northern tier ports as a group and in undue prejudice and disadvantage to the southern tier ports," and that they "are not shown to be just and reasonable." Equalization of Rates, supra, at 741, 742.

In its answer to the complaint in this action the United States admitted that the Commission's order was erroneous in that it treated the proposal vis-a-vis the northern tier ports as a group and failed to consider the lawfulness of the proposed rates as to each port separately. As a result, the Commission reopened the proceedings "for reconsideration on the present record of the lawfulness of the proposed rates separately and independently on traffic to and from each northern tier port." The proceedings in this court were held in abeyance pending this decision.

On reconsideration the Commission affirmed its original holding and also found

Bergen County Chamber of Commerce; Bronx Board of Trade; Chamber of Commerce, Garfield, N. J.; Chamber of Commerce, Irvington, N. J.; Chamber of Commerce of Eastern Union County; Clifton Chamber of Commerce; Commerce and Industry Association of New York, Inc.; Hoboken Chamber of Commerce; Ironbound Manufacturers' Association, Inc.; The Maritime Association of the Port of New York; Newark Association of Commerce and Industry; New Jersey Industrial Traffic League, Inc.; Queensborough Chamber of Commerce; The Shippers Conference of Greater New York; The West New York Chamber of Commerce; West Side Association of

Commerce in the City of New York; and the railroads listed in paragraph one.

The intervening defendants include the Baltimore and Ohio Railroad Company; Canton Railroad Company; The Chesapeake and Ohio Railway Company; Norfolk and Western Railway Company; The Pennsylvania Railroad Company; Reading Company; Western Maryland Railway Company; the Delaware River Port Authority; the Virginia State Ports Authority; Norfolk Port and Industrial Authority; City of Philadelphia; Maryland Port Authority; Baltimore Association of Commerce; and the Maine Central Railroad Company.

that the greater distance of the northern tier ports from affected territory over Baltimore and Philadelphia "may not be ignored without running counter to the provisions of section 3(1) of the Act," p. 21, Recon.[5] Moreover, it found "so far as New York is concerned, rate equalization is not required to enable that port to meet the competition of the southern tier ports, and that, so far as Boston, Portland, and Albany are concerned, such equalization would not materially affect the flow of foreign traffic through any of these ports," p. 21, Recon.

The Commission's decision is attacked here generally as being erroneous in law, unsupported by essential basic findings and unsupported by substantial evidence on the record as a whole.

The specific object of attack by the plaintiffs in this proceeding is the Commission's conclusion of a section 3(1), 49 U.S.C.A. § 3(1) violation, and the weight the Commission attached to the sole subsidiary finding upon which this conclusion is based—that the northern tier ports have a distance disadvantage over Baltimore of from 223 miles in the case of Boston to 117 miles in the case of New York.

■■■ It is admitted by the plaintiffs that the function of a court reviewing an administrative decision is a limited one. The general rule is that "The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body," Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 694, 78 L.Ed. 1260 (1934), and specifically "the orders of the Commission are final unless (1) beyond the power which it could constitutionally exercise; or (2) beyond its statutory power or (3) based upon a mistake in law." I. C. C. v. Union Pacific R. R., 222 U.S. 541, 547, 32 S.Ct. 108, 111, 56 L.Ed. 308 (1911). Further, an order cannot be sustained unless supported by essential basic facts particularly stated. Atchison,

T. & S. F. Ry., v. United States, 295 U.S. 193, 55 S.Ct. 748, 79 L.Ed. 1382 (1935); United States v. Chicago, M., St. P. & P. R. R., 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023 (1935).

Under 49 U.S.C.A. § 15(7), the plaintiffs had the burden of proof to show that the proposed rates are "just and reasonable" within the meaning of section 1(5), free from unjust discrimination prohibited by section 2 and that they contain no undue preference or prejudice proscribed by section 3(1).

■■■ The evidence before the Commission showed and the Commission found that the four northern tier ports experienced a relative decline in the participation of total United States foreign tonnage in the period 1923–55, while the relative share of the southern tier ports increased markedly during the same period. Thus, even while the foreign traffic through New York during this period rose from 22.6 million gross tons to 36.2 million gross tons, its share of the total United States tonnage declined from 28.6 per cent to 14 per cent. Boston's participation dropped similarly from 4.7 per cent to 2.5 per cent. On the other hand the share of the southern tier ports of total United States imports and exports increased as follows: Philadelphia from 7.9 to 15.7 per cent, Baltimore from 8.4 to 10.4 per cent and Hampton Roads from 4.3 to 17.1 per cent.

Since these figures are not limited to affected territory traffic, nor even to rail tonnage, they are by no means conclusive proof of the plaintiffs' position; but they do serve as an indication of the trend in import-export traffic movement. In order to present a clearer and more complete picture of comparative traffic between all North Atlantic ports and affected territory the railroads conducted traffic studies during 1955–56 which showed that 75.8 per cent of imports and 63.7 per cent of exports (measured by carloads) moved through the southern tier ports. Similar, but incomplete

5. Page references so designated are to the mimeographed copy of the Report of the Commission on Reconsideration.

studies for the years 1946 and 1947 tentatively indicate that a downward trend of import-export traffic to affected territory on the lines serving New York exists.

The Commission points out that New York still clearly dominates general cargo traffic and that the preponderance of southern tier traffic consists of bulk cargo [6] which prefers these ports because of their modern, specialized facilities and services. It is also apparent, however, that bulk cargo is necessarily more sensitive to rate differentials and the Commission implicitly so acknowledges by noting that the equalization of ex-lake rates on grain from Buffalo has resulted in a shift of the relative shares of that traffic in favor of the northern tier ports. Moreover, New York's dominance in general cargo traffic is not sufficient reason for denying it and the railroads serving it the opportunity to compete for bulk cargo traffic, as "both types of cargo are considered essential to a healthy port economy." Equalization of Rates, supra, at 701.

There was, furthermore, extensive evidence from shippers, both private and representatives of various agencies of the United States, that the differential adjustment is a controlling consideration in their choice of ports. These witnesses supported equalization and testified to the need to provide relief from congested ports, bunching and inefficient utilization of cars and delays in the flow of traffic.

In addition to this evidence indicating the importance of the differential and showing the necessity for its removal, the plaintiffs presented proof that the proposed rates are just and reasonable. In view of the minimal amounts of the proposed reductions (reduction in reve-

nue from Chicago to Boston would be .08 cents per ton-mile on first-class traffic and .10 cents on Column 13 traffic, for example), the plaintiffs relied on a prima facie showing of revenues. There was testimony that, using representative origins and destinations and the proposed rates, for 96.8 per cent of all tonnage moving through the port of New York, the import traffic averaged a rate per ton of $19.20 and revenues per ton-mile of 2.47 cents, and that for export traffic these figures were $18.00 and 2.32 cents. In comparison the average revenue per ton-mile for Class I railroads in the United States is 1.384 cents.

The defendant railroads countered this evidence by showing that with respect to traffic through the port of New York the proposed rates were insufficient to return out-of-pocket costs. But, while it refused to find the rates compensatory, the Commission did find after restating and adjusting the cost evidence, that "the revenue from the proposed rates would equal or exceed by a very small margin the estimated out-of-pocket costs." Equalization of Rates, supra, at 735.

On this evidence the plaintiffs certainly established prima facie that the proposed rate schedule is just and reasonable. We now turn to the Commission's disposition of the case. As noted above, it disallowed the proposal principally on the ground that the rates would violate section 3(1). This section provides that

"It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway * * * or

---

6. "Ocean borne commerce is classified into two types of cargo. By far the largest in volume is bulk cargo. It consists generally of low-value heavy volume raw materials which are handled at the port by mechanical facilities and provide bottom loading for ships or may move as full cargoes. The other type, called general cargo, includes principally manufactured and semimanufactured goods of relatively high value, which are usually packaged. General cargo generally constitutes the more profitable 'top loading' for ships in a balanced cargo operation." Equalization of Rates, supra, at 700.

**836**

any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway * * * or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever * * *."

In one of the earliest cases to come before the Supreme Court under this Act, the Court said that when presented with a question of unjust discrimination, the Commission is to "take into consideration all the facts of the given case, among which are to be considered the welfare and advantage of the common carrier, and of the great body of the citizens of the United States * * * The commission is not only to consider the wishes and interests of the shippers and merchants of large cities, but to consider also the desire and advantage of the carriers in securing special forms of traffic, and the interest of the public that the carriers should secure that traffic, rather than abandon it or not attempt to secure it." Texas & Pac. Ry. v. I. C. C., 162 U.S. 197, 218, 16 S.Ct. 666, 40 L.Ed. 940 (1896). In 1940, Congress, by adding the National Transportation Policy, 49 U.S.C.A., note preceding section 1 affirmed and reiterated the view that the Act must be interpreted as a whole and the competing interests of shippers, carriers, and localities carefully balanced "to the end of developing a national transportation system. * * *"

■ While apparently recognizing these principles, the Commission, in this case, nonetheless wholly ignored them. It noted the voluminous testimony of shippers and receivers in favor of equalization, but in its conclusions completely disregarded this evidence. It considered the need of the plaintiffs and their competitive disadvantage, but discounted both in its findings. Its final decision rests solely on the proposition that some ports would be unduly preferred and others unduly prejudiced by the proposed rates.

In emphasizing the welfare of ports and port districts, the Commission apparently relied on the 1935 amendment to section 3(1) which added "ports, port districts, gateways and transit points," to the interests protected by that section.

In Texas & Pac. Ry. v. United States, 289 U.S. 627, 53 S.Ct. 768, 77 L.Ed. 1410 (1933), the Supreme Court had held that the word "locality" referred to "points of origin or destination" and did not include gateways. The purpose of the amendment was only to restore to the Commission a power which it had previously exercised, but which the Supreme Court had held the Commission did not have. Neither the legislative history nor the plain words of the amendment indicate that any change in the prevailing rules respecting undue preference and prejudice or any special treatment of ports and port districts was intended.

We find that the Commission erred in applying section 3(1) too narrowly and in not giving due weight to the interests of shippers, receivers, carriers, and inland localities.

■ The Commission in reaching the conclusion that the proposed rates violate section 3(1) relies on a single subsidiary finding—the distance disadvantage of the northern tier ports. In the light of the history of the differential, earlier decisions of the Commission concerning it, the original report issued in this case, and the facts of this case, this finding in the Report on Reconsideration and its import are somewhat difficult to understand and, in view of the applicable law, erroneous. In the first place, the differential was established to place all North Atlantic ports on a parity with respect to the aggregate of rail and ocean charges. No consideration whatever was given to disparity in rail distances then or later. On the contrary, when the Thurman-Cooley-Washburn Advisory Commission concluded in 1882 that the differentials should remain, it specifically rejected the "distance principle" as controlling port relationships and rested its award on the principle of "competitive opportunity."

Until it filed its Report on Reconsideration in this proceeding, the Commission, itself, has continually adhered to the proposition that distance plays no part in the determination of port differentials. It so stated even in its original report: "Such distance disadvantages as they (the northern tier ports) have are much less than the substantial differences to and from some other ports which have a parity or near parity of rates, including the Canadian ports, and the wide differences which obtain where the several South Atlantic and Gulf ports are equalized. * * * It is apparent that considerable disregard of rail distances is characteristic of all port adjustments, as it was in the establishment of the rates here dealt with." Equalization of Rates, supra, at 715, 716.

Even while proclaiming this new rule, the Commission ignores it. Import rates from Portland may remain on a parity with Baltimore in spite of a distance disadvantage of more than 300 miles. Moreover, the present differentials do not in any way reflect the distance differences.

Secondly, one of the purposes of the 1935 amendment to section 3 was, as the Commission had previously pointed out, Equalization of Rates, supra, at 716 and cites therein, to permit all ports and the carriers serving them to compete for all import and export traffic and thereby maximizing the number of ports available. The finding in this case, if pressed to its logical conclusion, would result in traffic flowing only through the most distance favored port. On the other hand, if applied only in this case, the decision is arbitrary and capricious.

Thirdly, the Commission has failed to distinguish between rates which carriers may voluntarily publish to meet competition pursuant to section 15(7) and rates which carriers, on complaint under section 3(1) may be required to change. It is now well established that carriers may, within the zone of reasonableness, adjust rates to meet competition—United States v. Chicago, M., St. P. & P. R. R., 294 U.S. 499, 506, 55 S.Ct. 462, 79 L.Ed. 1023 (1935); Texas & Pac.

Ry. v. United States, 289 U.S. 627, 636, 53 S.Ct. 768 (1933); New York Cent. R. R. v. United States, 99 F.Supp. 394 (D.C.Mass.1951)—in which case the issue to be decided is whether the *proposed* rates are lawful. In a complaint proceeding the question is whether the *existing* rates are lawful and, if not, whether they should be required to be changed. However, both the Report and the Report on Reconsideration give continuous indication that the Commission regarded this as a "port" case, not a "railroad" case. For example, the observation that "in the rare instances where rate changes in port relationships have been required by us, distance has been an important consideration," p. 21, Recon., while perhaps true, was totally irrelevant to the issues before it. Distance differences might be relevant insofar as they reflect differences in the cost and value of the services of plaintiff and defendant railroads, see United States v. Illinois Cent. R. R., 263 U.S. 515, 524 (1924), but the Commission made no such cost or value findings nor does the record contain evidence from which it could make such findings. We must, therefore, rule that its conclusion lacks the required basic findings to support it.

The Commission disapproved the plaintiffs' proposal on the additional ground that, insofar as New York is concerned, equalization is not necessary to enable that port to compete. This conclusion again is based on a misunderstanding of the nature of the proceedings. While the New York Port Authority and other New York governmental and commercial interests were undoubtedly active participants in the case, the primary issue is whether equalization is necessary to enable the plaintiff railroads to compete. And the evidence showed that the share of traffic handled by these railroads has been declining.

The last reason given in support of its decision is that with respect to the ports of Boston, Albany and Portland, "equalization would not materially affect the flow of traffic to these ports." Not only does this statement completely con-

**838**

tradict the Commission's ultimate conclusion of undue prejudice to the southern tier ports, but it ignores the plaintiffs' right to attempt to gain some of this traffic for their lines.

We, therefore, conclude that the Commission's decision is erroneous in law and lacks the rational basis necessary to uphold it and it must be set aside. A judgment may be entered setting aside the order of the I. C. C. and issuing a permanent injunction as prayed for.