The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Chicago, Rock Island, and Pacific Railroad Company, Fort Worth and Denver Railway Company, and Missouri-Kansas-Texas Railroad Company, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

No. 64 C 66.

United States District Court N. D. Illinois, E. D.

July 7, 1964.

Floyd Stuppi, Harvey Huston, Chicago, Ill., Lloyd W. Jones, Denison, Tex. Sterling W. Steves, Fort Worth, Tex., Don McDevitt, Chicago, Ill. (Milton E. Nelson, Jr., Chicago, Ill., of counsel), for plaintiffs The Atchison, Topeka and Santa Fe Ry. Co., Chicago, Rock Island and Pacific R. Co., Fort Worth and Denver Ry. Co., and Missouri-Kansas-Texas R. Co.

Robert Kennedy, Atty. Gen., U. S. Dept. of Justice, Washington, D. C., Edward V. Hanrahan, U. S. Atty., Chicago, Ill., Robert W. Ginnane, Gen. Counsel, John H. D. Wigger, N. Neil Garson, William H. Orrick, Jr., Interstate Commerce Commission, Washington, D. C. (Erwin I. Katz, Asst. U. S. Atty., Chicago, Ill., of counsel), for defendants the United States and Interstate Commerce Commission.

J. L. Lockett, Jr., Milton K. Eckert, Houston, Tex., for intervening plaintiff Houston Port Bureau, Inc.

Ballinger Mills, Jr., and John Eckel, McLeod, Mills, Shirley & Alexander, Galveston, Tex., for intervening plaintiff Bd. of Trustees of the Galveston Wharves, an instrumentality of the City of Galveston, Tex.

Joseph E. Quin, Washington, D. C., for intervening plaintiff Orville L. Freeman, Secretary of Agriculture of the U. S.

Nuel D. Belnap and Daniel J. Sweeney, Belnap, Spencer, Hardy & Freeman, Chicago, Ill., Frank C. Brooks, Brooks, Montgomery & Matthews, Dallas, Tex., for intervening defendant Brazos River Harbor Navigation District of Brazoria County, Tex.

Before KNOCH, Circuit Judge, and MAROVITZ and PARSONS, District Judges.

PARSONS, District Judge.

As the Gulf of Mexico frames the Southeast boundary of the State of Texas, a number of bays and inlets provide natural settings for ports for seagoing vessels. Principal among these ports are those located at or near the Texas cities of Houston, Galveston, Texas City and Freeport. Railroad lines of the Chicago, Rock Island and Pacific Railroad Company, the Atchison, Topeka and Santa Fe Railway Company, the Fort Worth and Denver Railway Company, the Missouri-Kansas-Texas Railroad Company, and the Missouri Pacific Railway Company, run from points west, north and northeast into each of these Gulf ports, except that only the Missouri Pacific Railway Company runs also to Freeport, the southernmost of these ports. More than seventy other railroads by connections with these five roads are available for shipments to and from these several Gulf ports. All railroads, however, must depend for movements to and from Freeport upon connection through the Missouri Pacific Railway. Their shipping rates to Freeport have been higher than to the other three ports.

Freeport is located on Brazos Harbor and is the oldest port on the Texas coast. It was an active port for shipping until 1918, when the accumulation of silt deposited by the Brazos River precluded its use by oceangoing vessels. Thereafter, the ports at Houston, Galveston and Texas City became the principal ports along that part of the Gulf. Activities to reestablish Freeport as an active port began in 1927, and after much work and sacrifice taxwise on the part of the property owners of the area, dock facilities were completed and the first seagoing vessel docked at the new port of Freeport in 1955. No grain storage facilities are available yet, but there are companies who would spend the millions needed for their construction if railroads would ship as cheaply to Freeport as they do to Houston, Galveston and Texas City. When the railroads refused voluntarily to accord Freeport rate equality with those nearby ports, the Brazos River Harbor Navigation District, the political entity which constructed and maintains the new port, filed a complaint with the Interstate Commerce Commission, asking that the railroads be required to remove their rate discrimination against it. On April 30, 1963, Division 2 of the Com-

mission issued a report and order granting Freeport the relief it sought.

. This is an action brought by the Atchison, Topeka and Santa Fe Railway Company, the Chicago Rock Island and Pacific Railway Company, the Fort Worth and Denver Railway Company, and the Missouri-Kansas-Texas Railroad Company, to enjoin, set aside, suspend and annul an order of the Interstate Commerce Commission entered on April 30, 1963, in the proceeding before it entitled Brazos River Harbor Navigation District of Brazoria County Texas v. The Abilene and Southern Railway Company, et al., Docket No. 33558, 319 I.C.C. 54, and 322 I.C.C. 528. The Houston Port Bureau, Inc., intervened as plaintiff on behalf of the railroads. The Brazos River Navigation District and the Department of Agriculture intervened as defendants on behalf of the Government and the Interstate Commerce Commission.

The complaint before the Commission had alleged that the rail rates maintained by 82 carriers on traffic moving in interstate and foreign commerce through the Port of Freeport from and to points in Texas, Louisiana, Oklahoma, Kansas, Arkansas, Missouri, New Mexico, Colorado, Arizona and California, were higher than rail rates applicable to the same traffic moving from and to the same points in these states through the ports of Galveston, Texas City and Houston. It charged that such higher rates were (1) unjust and unreasonable, and (2) unduly prejudicial to the Port of Freeport, in contravention of 49 U.S.C.A. §§ 1 and 3.

The Commission found that there had been no showing that the higher rates were unjust and unreasonable, but that it had been shown that the rates were unduly prejudicial to the Port of Freeport, and therefore violative of 49 U.S. C.A. § 3. On April 30, 1963, the Commission ordered the railroads to "cease and desist * * * from practicing [this] undue prejudice and preference * * *." The Commission affirmed its order on November 19, 1963, and, as later to be discussed herein, "amplified" its order on April 22, 1964. At the time this matter came before this Court, the effective date of the Commission's order was August 5, 1963. Today, the effective date of the order is July 7, 1964.

Jurisdiction of this Court has been invoked under 28 U.S.C.A. §§ 1336, 1398, 2284, 2321–2325 inclusive, and 5 U.S.C.A. § 1009. Plaintiff railroads in their original and amended complaints before us assert that the orders of the Commission are unlawful for the following reasons: (1) The Commission failed to make certain basic and essential findings of fact necessary to support its conclusions, such as a finding that the higher rates actually resulted in injury to the Port of Freeport, and a finding that the traffic through both the preferred and prejudiced ports moves under substantially similar circumstances and conditions; (2) the Commission erroneously construed Section 3(1) of the Interstate Commerce Act as requiring it to place the four ports on a rate parity; (3) the findings of the Commission compel the conclusion that the higher rates are actually not discriminatory; (4) the Commission based its order on the erroneous principle that discrimination can be found alone on a comparison of the distances of the four ports from the points of origin or destination of rail shipments; and (5) the Commission erred in failing to consider the effect of its orders upon the revenues of the plaintiff railroads.

Regarding this last contention, plaintiff railroads urge strongly that the effect upon them of the Commission's orders would be to compel them to increase their rates to the Galveston, Texas City and Houston ports, or to require the Missouri-Pacific Railway Company (not a party to these proceedings) to join them in rate reductions to Freeport; and under either alternative would cause traffic to be diverted from their roads to the Missouri-Pacific, whose lines also reached to some of the same points of origin or destination. Plaintiff railroads thus without justification would be deprived of substantial revenue.

## I.

At the outset, this Court is confronted with a procedural issue of potential constitutional significance. The original order of the Commission emanated from a 2 to 1 majority of its Division 2, on April 30, 1963. (319 I.C.C. 54). Plaintiff railroads then filed a petition for reconsideration by the entire Commission, alleging the inadequacy of the Division 2 report and order. On November 19, 1963, that petition was denied. Under Section 17(4) of the Interstate Commerce Act [49 U.S.C.A. § 17(4)], the determination of November 19, and its order that the railroads proceed with the publication of reduced rates, became administratively final. Again, on January 9, 1964, plaintiff railroads filed another petition with the Commission asking it to reconsider its ruling and order, and seeking a postponement of the effective date of rate reduction announced in the order of November 19. As the days approached the deadline for advance publication of rate reduction to meet the schedule set out in the order of November 19, and the Commission not having acted on this second petition for reconsideration, the plaintiff railroads came into this Court, filed their complaint for a permanent injunction, and asked as an emergency matter that this Court temporarily restrain the operation of the Commission's orders pending a final determination on the complaint. The Judge of the District Court to whom the case was assigned issued the temporary restraining order and forthwith applied to the Chief Judge of the Court of Appeals for the Seventh Circuit for the appointment of a Three-Judge Court to hear the matter. Forthwith the appointments were made, and with all of the parties before him, including the Interstate Commerce Commission, the District Judge set up a schedule for pleadings and briefs, and set the cause to be heard by the Three-Judge Court at 2:00 P.M. on May 21, 1964. The other judicial affairs of the three Judges were arranged to meet this schedule. However, on March 17, 1964, without notice to the other parties, or request from or notice to the Court, the Interstate Commerce Commission, on its own motion purportedly "for good cause appearing" issued a further order reopening its case (I.C.C. Docket 33558) for the purpose of "reconsideration" of the Division 2 report and order.

On March 23, 1964, this action on the part of the Commission was for the first time brought to the attention of the District Judge by a filing by the parties of a stipulation that all further proceedings in this cause be stayed for a period of thirty days, pending a reconsideration by the Commission of its order of April 30, 1963. It is again to be noted that no request was made of the Court to stay its proceedings prior to the Commission's ex parte action of March 17. It is also to be presumed from the language of the stipulation that the understanding allowed the plaintiffs by the Government and the Commission was that the new proceedings before the Commission would in fact be a reconsideration in the traditional meaning of that word. On April 27, 1964, the other parties and the Court were informed that on April 22, 1964, a new order of the Interstate Commerce Commission had been rendered superseding and "amplifying" the original order of April 30, 1963. (322 I.C.C. 530). This new order set the effective date for the rate decreases at July 7, 1964. The original schedule set by the Court became meaningless. The temporary restraining order became unnecessary and was discharged (28 U.S.C. § 2284). Plaintiffs were given time to plead over, and new dates were set for responsive pleadings and briefs. A new date for hearing before the Three-Judge Court was set for June 17, 1964, at 2:00 P.M., and again the Judges rearranged their other judicial affairs to accommodate this change in the schedule. The matter was heard on that date.

Plaintiffs before us complain that the Commission arbitrarily abused its discretionary power to reopen the proceedings before it, not for the purpose of permitting the original parties before it to re-present their cases, but for the

purpose of permitting itself, after having had the benefit of reviewing the propositions advanced by the railroads in their complaint before this Court, to reconstruct its earlier findings and opinion before filing its answer and brief in this Court. Plaintiffs contend that this conduct on the part of the Commission constitutes a denial of due process of law as provided for in the Fifth Amendment to the Constitution.

In Dixie Carriers, Inc. v. United States, 143 F.Supp. 844 (S.D.Texas 1956) a Three-Judge Court was faced with a similar situation. It approached the situation by looking at the reason given in the new Commission order for reopening the case, i. e., "good cause appearing therefor", and reasoning that such a cryptic phrase was inadequate to support the reconsideration of the earlier order, held the new order to be void and of no effect. The Commission explained that it had subsequently issued an additional order to supply the necessary findings and reasoning omitted from the earlier order. But the Court in rejecting this excuse stated at page 850 of 143 F.Supp.:

> "The simple phrase 'and good cause appearing therefor' is inadequate to upset prior positive findings, and for the reasons set forth in Amarillo-Borger [Express v. United States, 138 F.Supp. 411 (N.D. Texas, 1956)] cannot, on judicial review, stand."

The Court in Dixie Carriers went on to state at page 852 of 143 F.Supp.:

> "If administrative agencies, no matter how highly motivated their particular action may be, can, under the form of *nunc pro tunc* corrective orders, presumably 'correct' the subject order to meet the objections specifically urged in a petition for judicial review, effective review would be denied."

In the case relied on in Dixie Carriers, Amarillo-Borger Express v. United States, 138 F.Supp. 411 (N.D.Texas 1956), the Court stated at page 417:

> "If the cryptic phrase 'good cause appearing' is a sufficient indication of

action, it will be a self-generating bar to any review since, 'the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based', Securities and Exchange Commission v. Chenery Corp., 318 U.S. 80 [63 S.Ct. 454, 459, 87 L.Ed. 626]."

There is no question that the Interstate Commerce Commission is empowered to reopen and reconsider determinations previously made. 49 U.S.C.A. 16a; Baldwin v. Scott County Milling Co., 307 U.S. 478, 483–484, 59 S.Ct. 943, 83 L.Ed. 1409 (1939).

■ We find no reported court decisions, however, squarely facing the question of the authority of the Commission to reopen and reconsider its order *after* it has become the subject matter of a court proceeding, as in the instant case. The Government and the Commission have cited to us numerous instances wherein proceedings by the Commission were reopened following the institution of court action. However, it appears from the Government's and Commission's annotation of them that court approval of the stay of its proceedings, pending Commission reconsideration, was obtained *prior* to the Commission's order reopening the proceedings before it.

The Commission's reopening of the proceedings before it, while they are the subject matter of judicial review, without prior request of or notice to the Court, does not of itself appear to be sufficient reason to justify the Court's holding the subsequent order of the Commission void and of no effect. Even though this manner of a Commission's exercising its authority to reconsider may cause the Judges of the reviewing court substantial difficulty in adjusting their judicial schedules, and may be offensive to the tradition and rules of court by which lower courts are unable to act in their matters once they are pending on appeal, courts may deserve and expect the courtesy of prior notice from the Commission, but we are reluctant to hold that they may demand it.

■■ On the other hand, two serious problems are raised by this practice of the Commission. The first relates to the constitutional principle of separation of powers. In the absence of express constitutional provision for executive agencies with quasi-legislative and/or quasi-judicial functions, their clear constitutionality rests upon their capacity to function exclusively within the limits of each of their several personalities. It is only where there is a pretense of one personality, while in fact there is the performance of another, that the action of a regulatory agency with judicial functions becomes arbitrary, capricious and unconstitutional. The act of defending in court a judicial determination is executive and not judicial. When to perfect that defense an *ex parte* reconsideration of a judicial determination is made, such reconsideration is an executive act done in the guise of the judicial, and is arbitrary and unfair. It has long been established that even where two or even three heads of these great and splendid multi-headed creatures of modern government perform at the same time, even where that multi-performance is acted out by the same unit or even by one individual, the performance of each head must be true to its character, and one may not act in the guise of the other.

This principle, which properly has been labeled "separation of functions" as it applies to administrative agencies, has been the focal point of controversy and the resulting litigation has been extensive. In all its ramifications, however, there has been unanimity of authority in the basic philosophy which finds statutory expression in Section 5 of the Administrative Procedure Act, 5 U.S.C.A. § 1004(c), in the 1952 amendments of the Communications Act, 47 U.S.C.A. § 409 (a)–(d) and in the provisions of the Labor Management Relations Act, 1947, 29 U.S.C.A. § 154(a); and which finds judicial expression in language to be located in Marcello v. Bonds, 349 U.S. 302, 315–319, 75 S.Ct. 757, 99 L.Ed. 1107 (1955) (dissenting opinion of Mr. Justice Black and Mr. Justice Frankfurter); in Sacher v. United States, 343 U.S. 1, 23–42, 72 S. Ct. 451, 96 L.Ed. 717 (1952) (dissenting opinion of Mr. Justice Frankfurter); in In re Murchison, 349 U.S. 133, 136–139, 75 S.Ct. 623, 99 L.Ed. 942 (1955); in Wong Yang Sung v. McGrath, 339 U.S. 33, 36–45, 70 S.Ct. 445, 94 L.Ed. 616 (1950); and in Federal Trade Commission v. Ruberoid Co., 343 U.S. 470, 480–494, 72 S.Ct. 800, 96 L.Ed. 1081 (1952) (dissenting opinion of Mr. Justice Jackson).

The basic idea that executive, legislative and judicial functions should to a considerable extent be separated out from each other still prevails in our dominant theoretical thinking, though in effecting it with reference to administrative agencies, we must rely in the final analysis upon the check afforded by just such judicial review as herein attains.

The other problem raised is that of due process of law, and it is a denial of due process of law when a judicial branch of a regulatory agency, under review by the court, once made aware by the executive branch of that agency of a litigant position taken in seeking higher judicial review of its determination, may change, without notice to the appellant and an opportunity to be heard, and adjust the form of its judicial position to facilitate a victory by its executive branch of its original determination. This, too, is arbitrary and unfair.

■ This situation attaining in the instant case might well be controlling and demand of this Court that it hold the report and order of April 22, 1964, void and of no effect, were it not for one factor here by which the plaintiffs are bound. By stipulations recorded, plaintiffs have agreed that further proceedings in the District Court be stayed pending the Commission's reconsideration of its original order. Although this agreement postdates the *ex parte* action of the Commission, plaintiffs are estopped from complaining that the Commission's action in this respect was either arbitrary or unfair. This still leaves the question of whether or not the Commission's action of "amplifying" its original order under

the guise of "reconsidering" it, was arbitrary and a denial of due process. Here, again, plaintiffs are now estopped from complaining. After the new order of April 22, 1964, plaintiffs, on May 4, 1964, were given seven days in which to amend their complaint or otherwise plead. On May 11, a supplemental complaint was filed, and although it complained that the so-called "reconsideration" by the Commission was arbitrary and a denial of due process of law, plaintiffs did not ask that the proceedings of the Commission be stricken or held null and void and of no effect, but rather asked this Court to proceed on with a determination that the orders of the Commission, presumably both the orders of April 30, 1963 and April 22, 1964, be enjoined. The supplemental complaint of plaintiffs thus attacked the order of April 22, 1964, on its merits.

In addition, we are convinced that, upon due consideration of all the facets of the matter before us, no prejudice has resulted to the plaintiffs as a result of the manner in which the Commission handled its "reconsideration" and that under all the facts and circumstances the instant matter does not justify the drastic action which might be taken with relation to the Commission in a more appropriate case.

## II.

The United States of America, the Interstate Commerce Commission and the Secretary of Agriculture reiterate in their joint brief and argument the traditional view advanced on other occasions by the Interstate Commerce Commission as to the scope of judicial review in these cases. They say that "Judicial review * * * is limited by the rule of administrative finality. This rule prescribes that a reviewing court will not upset an order of the Commission if the order is within the Commission's statutory authority and is based upon adequate findings which are supported by substantial evidence." As in other instances, they cite the half century old case, Interstate Commerce Commission v. Union Pacific Railroad Company, 222 U.S. 541, 32 S.

Ct. 108, 56 L.Ed. 308 (1912), which held that "the courts will not examine the facts further than to determine whether there was substantial evidence to sustain the order." Other cases cited by them lend support to this restrictive view of the court's power of review.

█  We remind the Commission that our task requires a review of the *whole* record. Following the admonition of the Supreme Court in Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), this Court held in Chicago Rock Island and Pacific Railroad Company v. United States and the Interstate Commerce Commission, 205 F.Supp. 378 (N. D.Ill.1962), that the scope of judicial review of an order of the Interstate Commerce Commission is not limited merely to an examination of the evidence supporting findings reached by the Commission, but is based upon a review of the *whole* record. It is true that, prior to 1951, the courts held that in order to determine if there was substantial evidence supporting the agency's decision, a district court need read only the side of the case for which the Commission ruled, and, if it found any evidence there, the Commission's action would be sustained; but dissatisfaction with this restrictive scope of review led to the enactment of the Administrative Procedure Act and the 1947 Amendments to the Labor Relations Act. Those statutes contained an express direction to reviewing courts to consider the "whole" record in determining whether administrative findings have the required evidentiary support.

As the Supreme Court observed in Universal Camera Corporation v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 464 (1951):

"Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new

legislation definitively precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record."

Of the same purport was the decision in National Labor Relations Board v. Pittsburgh S. S. Co., 340 U.S. 498, 71 S.Ct. 453, 95 L.Ed. 479 (1951). See also, Schwartz, A Decade of Administrative Law, 51 Mich.L.Rev. 775 (1953), as well as such recent decisions as National Labor Relations Board v. Isis Plumbing & Heating Co., 322 F.2d 913 (9th Cir. 1963); National Labor Relations Board v. Walton Manufacturing Co., 322 F.2d 187 (5th Cir. 1963); and Lawson Milk Co. v. National Labor Relations Board, 317 F.2d 756 (6th Cir. 1963).

In determining whether there is substantial evidence of public convenience and necessity to support the Commission's findings and decision here, we must carefully examine all of the evidence presented to the Commission. The hearings were protracted and a recital of all the evidence at this moment would be extensive and needless. It is important, however, to account for certain compelling facets of evidence considered by the Commission.

The Freeport authorities presented to the Commission, *inter alia*, the following: (1) Testimony that the transportation conditions to and from points in Eastern New Mexico, Colorado, Louisiana, Texas, Oklahoma, Kansas, Arkansas and Missouri, through the allegedly preferred and prejudiced ports, are not sufficiently dissimilar to justify the rate differences. (2) Evidence, including maps, showing that the differences in rail distance between Freeport and these same points of origin or destination on the one hand, and between the Houston, Texas City and Galveston ports and these points on the other hand, are insubstantial and, in some instances, are negligible and even trivial. (3) Testimony that in order for Freeport to acquire full grain handling and storage facilities through private investments, there must be a reduction of rail rate to Freeport to place it on a parity with the other ports. (4) Evidence that, as to grain and grain products, the Commodity Credit Corporation, as well as private shippers, processors and merchandisers, have in the past experienced disadvantage as a result of the failure of the railroads to accord Freeport parity, in that in times of heavy grain flow, they have been confronted with severe congestion and freight car delays at the preferred ports with resultant increased switching and demurrage charges. (5) Testimony that exporters and importers of other than grain commodities, who prefer the preferred ports for reasons other than those relating to rail rate preference, are prevented from switching to the use of Freeport during periods of congestion at the other ports by the fact of the higher rail rates maintained through Freeport. (6) Testimony of shippers which shows that they desire rail rate equalization of Freeport with the Houston port group to take advantage of connections with other shippers who do use Freeport, and to avoid the disadvantages they experience in periods of congestion in the Houston port group. And (7) evidence that unless Freeport receives rate parity, it will never attract private investment in the construction of grain handling and storage facilities, and consequently the tax investment of the citizens of Freeport in modernizing their port facilities will become a serious tax loss.

The railroads, on the other hand, in support of the position they took presented the Commission, *inter alia*, the following: (1) Testimony showing that shippers would continue to use the Houston port group, even were there rate parity with Freeport, since Freeport, without grain handling and storage facilities, could not be used for bulk grain shipment anyway. (2) Exhibits showing that motor carriers advertise equalized services to all four ports, including Freeport, but testimony showing

that Freeport has failed to attract business through these carriers. (3) Evidence that, even though there has existed rate parity for Freeport with relation to many commodities other than grain, shippers still have preferred the Houston port group over Freeport. (4) Evidence that over the years, by both rail and motor carrier facilities, Freeport has never secured more than a modicum of export and import traffic in commodities where there has been rate equalization. (5) Data showing that, even though what Freeport provides is very new and modern, it still is a relatively small port in comparison to the major Texas ports along the Gulf, in that, for example, it has facilities for berthing only three ships, whereas both Galveston and Houston each can berth thirty-three vessels, and each has transit shed space ten to twelve times that of Freeport. (6) Data showing that Freeport not only lacks storage and handling facilities for grain, but for other commodities needing processing at the port location, such as baling facilities for cotton, Freeport is missing in the collateral services needed for a successful port. And (7) testimony that rate preferences have not been directed toward defeating Freeport, but have resulted from the demands of competition with motor carrier facilities.

We note that the railroads, while showing some areas of dissimilarity of circumstances between the Houston port group and Freeport, were unable to match the compelling mass of evidence showing rail distances between points of origin or destination and Freeport on the one hand, and the other ports on the other, to be for all practical purposes minimal.

■ We observe that evidence showing the tax expenditures of Freeport's citizens to develop their port, and the loss which they would experience if rate parity would prevent their completion of a truly competitive port, is irrelevant to the issues properly under consideration, and should not have been admitted or given weight; yet in another posture it cannot be ignored that the combined difference in rate and transit arrangements had been the cause of Freeport's inability to attract those collateral facilities which would allow it a competitive standing beside the other Gulf ports.

We recite along with the Commission (322 I.C.C. 534) that when Congress amended Section 3 of the Act (49 Stat. 607, 1935) to include "ports", the amendment was intended to "afford competing ports a forum in which to complain if rate adjustments which tend to concentrate the movement of traffic through one or a limited number of ports and to deprive other ports of an opportunity to handle a part of such traffic" and to "encourage and promote the freedom of movement of export, import, and coastwise commerce through the ports of the country." We concur with the Commission that this lack of commodity movement through Freeport is substantially the result of the rate inequality imposed upon it by the railroads and "is the type of injury Congress had in mind when it amended Section 3 to include 'ports'."

■ From all the evidence before it, the Commission was adequately justified in finding (1) that there are no appreciable differences in rail mileages to Freeport and to the Houston port group; (2) that there are present no substantial transportation conditions whose dissimilarity would warrant the rate inequality between the ports involved; (3) that rate equality will allow Freeport to acquire those collateral facilities which will permit it full competitive standing with the other ports; (4) that though already there has been rate equality without apparent benefit to Freeport on many commodities other than bulk grain, grain shipments through these ports constitute the principal foundation of their business, and it is with relation to grain shipments wherein preference and prejudice have been exercised toward the Houston port group and against the port at Freeport. We concur with the position taken before us by the Commission that the evidence supports substantially its finding that there exists such undue prejudice to the Port of Freeport, in con-

**432**

travention of 49 U.S.C.A. § 3, as would warrant its cease and desist order.

This court thus concludes that the Commission's findings were reasonable and supported by substantial evidence. Therefore, the motion of the plaintiffs for a permanent injunction should be and the same hereby is denied, and the complaint is dismissed.