Let an appropriate order be submitted.

**CITY OF GALVESTON et al., Plaintiffs,**

**v.**

**UNITED STATES of America and Interstate Commerce Commission, Defendants.**

**Civ. A. No. 65–H–594.**

United States District Court
S. D. Texas,
Houston Division.
Aug. 11, 1966.

---

McLeod, Alexander, Powell & Apffel, V. W. McLeod, Galveston, Tex., and Belnap, Spencer, Hardy & Freeman, Harold E. Spencer, Chicago, Ill., for City of Galveston and others.

Fulbright, Crooker, Freeman, Bates & Jaworski, E. V. Greenwood, Houston, Tex., and Belnap, Spencer, Hardy & Freeman, Harold E. Spencer, Chicago, Ill., for Houston Port Bureau, Inc., and others.

Frank A. Leffingwell, Dallas, Tex., for Nueces County Navigation Dist. No. 1.

W. A. Thie, Dallas, Tex., for Atchison, Topeka & Santa Fe Ry. Co.

Don McDevitt, Chicago, Ill., for Chicago, Rock Island & Pacific R. Co.

Sterling W. Steves, Fort Worth, Tex., for Fort Worth & Denver R. Co.

Milton E. Nelson, Jr., Chicago, Ill., Franklin, Kelly, Graham & Laughter, W. Kenneth Graham, Houston, Tex., for Missouri-Kansas-Texas R. Co.

Frank A. Leffingwell, Dallas, Tex., Sam Dawkins, Jr., Houston, Tex., for Gulf Compress.

Donald F. Turner, John H. D. Wigger, Washington, D. C., for United States of America.

Robert W. Ginnane, Robert S. Burk, Washington, D. C., Woodrow Seals, U. S. Atty., and J. H. Baumgarten, Asst. U. S. Atty., Houston, Tex., for Interstate Commerce Commission.

Before BROWN, Circuit Judge, and HANNAY and INGRAHAM, District Judges.

INGRAHAM, District Judge:

The ports of Houston and Galveston and four of the original twenty-six defendant railroads seek to set aside an order of the Interstate Commerce Commission entered in Nueces County Navigation District No. 1 v. Atchison, Topeka and Santa Fe Railway Company, et al., 325 I.C.C. 400 (1965). The order held that the export rates for cotton from specified origins in northern Texas, Oklahoma and New Mexico were unduly prejudicial to the port of Corpus Christi and unduly preferential to the ports of Houston and Galveston, in violation of Section 3(1) of the Interstate Commerce Act, 49 U.S.C.A. Section 3(1).[1] This court concludes that the order is supported by substantial evidence, is consistent with Section 3(1), and meets the requirements of the Administrative Procedure Act, 5 U.S.C.A. Section 1001, et seq. This court enforces the order by denying relief and dismissing the cause on its merits.

This court properly performs only a very limited role in reviewing a decision of an administrative body such as the ICC. Once a rational basis for the conclusions of an administrative body is found, the judicial function is ended. Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286–287, 54 S.Ct. 692, 78 L.Ed. 1260 (1934). Courts are not empowered to weigh the wisdom of a particular decision:

"It cannot substitute its own view concerning what should be done, whether with reference to competitive considerations or others, for the Com-

---

1. Section 3(1) of the Interstate Commerce Act, 49 U.S.C.A. Section 3(1):
 "It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever * * *"

mission's judgment upon matters committed to its determination, if that has support in the record and the applicable law." United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946).

■ Courts have long recognized the application of this principle to discriminatory rail rate situations and pointed to the particular considerations which support the rule in this area. Whether a discrimination or preference is undue, unreasonable and unjust is a determination for the ICC to make. Nashville, C. & St. L. Ry. v. State of Tennessee, 262 U.S. 318, 322, 43 S.Ct. 583, 67 L.Ed. 999 (1923). A court "has no concern with the correctness of the Commission's reasoning, with the soundness of its conclusions, or with the alleged inconsistency with findings made in other proceedings before it." Virginian Ry. v. United States, 272 U.S. 658, 665–666, 47 S.Ct. 222, 225, 71 L.Ed. 463 (1926). Congress has constituted the ICC as the expert body which is informed by experience to determine whether undue discriminations exist in rail rates.

"The complexities and involvements of railroad rates are not to be shifted from the shoulders of the experts commissioned to handle them to the backs of the judiciary; nor are the broad powers of judgment conferred upon the experts to be unduly hampered." Koppers Company, Inc. v. United States, 166 F.Supp. 96, 103 (W.D.Pa. 1958).

■ This court must determine whether the Commission has followed correct legal procedures and principles, but beyond that this court is permitted no greater role than ascertaining whether there exists a rational basis for the ICC order.

" * * * We would depart from our competence and our limited function in this field if we undertook to accommodate the factors of transportation conditions, distance and competition differently than the Commission has done in this case. This is a task peculiarly for it." Ayrshire Collieries Corp. v. United States, 335 U.S. 573, 593, 69 S.Ct. 278, 289, 93 L.Ed. 243 (1949).

■ The ICC findings under review here are sketchy and present this court with difficulties which more explicit findings would remove. The ICC opinion is so imprecise in revealing just what findings it is making that the order borders dangerously on running afoul of the requirement that agencies disclose the basis of their orders.[2]

However, this court concludes that the findings are adequate under Section 8 (b) of the Administrative Procedure

2. "Expert discretion is the lifeblood of the administrative process, but 'unless we make the requirements for administrative action strict and demanding, expertise, the strength of modern government, can become a monster which rules with no practical limits on its discretion.' State of New York v. United States, 342 U.S. 882, 884, 72 S.Ct. 152, 153, 96 L.Ed. 662 (dissenting opinion). 'Congress did not purport to transfer its legislative power to the unbounded discretion of the regulatory body.' Federal Communications Com'n v. RCA Communications, Inc., 346 U.S. 86, 90, 73 S.Ct. 998, 1002, 97 L.Ed. 1470. The Commission must exercise its discretion under § 207(a) within the bounds expressed by the standard of 'public convenience and necessity.' Compare id at [346 U.S.] at 91, 73 S.Ct. at 1002, 97 L.Ed. 1470. And for the courts to determine whether the agency has done so, it must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.' Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 197, 61 S.Ct. 845, 854, 85 L.Ed 1271. The agency must make findings that support its decision, and those findings must be supported by substantial evidence. Interstate Commerce Comm'n v. J-T Transport Co., 368 U.S. 81, 93, 82 S.Ct. 204, 211, 7 L.Ed.2d 147; United States v. Carolina Carriers Corp., 315 U.S. 475, 488–489, 62 S.Ct. 722, 729, 86 L.Ed. 971; United States v. Chicago, M. St. P. & P. R. Co., 294 U.S. 499, 511, 55 S.Ct. 462, 79 L.Ed. 1023." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 167–168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962).

Act, 5 U.S.C.A. Section 1007(b). No purpose would be accomplished by returning the case to the ICC for further findings.

The ICC decision here must be tested on the basis of what it contains, and not on any new ideas offered to support it. The United States, the ICC, and the defendant intervenors have offered new rationales for the ICC order, but whatever their merits, such suggestions could only call for remand to the agency for consideration. S. E. C. v. Chenery Corp., 318 U.S. 80, 94–95, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

However, plaintiffs have repeatedly insisted that a remand to secure more precise findings would accomplish nothing. They maintain that the factual record is so deficient that no findings, however explicit, can support the order.

This court deems that the ICC was aware of what it was doing and intended the result it achieved. It did not purpose to go outside traditional guidelines or to establish new precedents designed to advance the equalization of all ports. New or improved findings would not serve to articulate the process of decision and expose the factual weaknesses.

The order stands or falls on the sufficiency of the findings made and the evidence to support them.

■ Before the ICC can equalize rates, there must be an adequate factual showing of (a) prejudice, and (b) prejudice which is undue resulting from a rate disparity or "misalignment of rates". Atchison, T. & S. F. Ry. v. United States, 218 F.Supp. 359, 363 (N.D.Ill., 1963). Plaintiffs assert that to make an initial showing of prejudice, rates to the more distant port must be shown to be higher *relative mileage considered* than those to the nearer port. If the rates *per mile* are not higher to the more distant port, plaintiffs claim that there is no showing of prejudice.[3]

■ This court squarely rejects this mechanical definition of prejudice. Prejudice is a practical consequence in the practical world of transportation. That Corpus Christi is prejudiced is established by uncontradicted testimony in the record. Corpus Christi has ample shipping facilities and liner services. It is geographically and frequently by highway distances closer to this cotton origin territory than Houston-Galveston, yet Corpus Christi cannot get a single bale of cotton by rail for export.[4] Corpus Christi now gets practically no cotton from these origins by truck.[5] This result is a direct consequence of the rail rate structure. Shippers decline to ship cotton to Corpus Christi simply because it costs about 25¢ per bale more than does shipping to Houston-Galveston. Per mile or "distance considered" rates do not figure in their calculations.

---

3. Plaintiffs' claim is based on general language found in two ICC decisions:

"However, the respondents have shown that the proposed rates are reasonably graded according to shortline distances, and since their proposal would allow the protestants rates which are *relatively no higher* than those afforded other shippers in the area, no basis exists for a finding of prejudice which is undue." (Emphasis supplied.) Grain from Groups I & J Origins to Pacific Coast, 299 I.C.C. 129, 134 (1956).

" * * * it is difficult to understand how undue prejudice under section 3 can be present where rates are made on precisely the same level, mile for mile, from all competitive producing points to common destinations." Paper from the South and Southwest, 218 ICC 202, 216 (1936).

4. Since the issue is prejudice regarding cotton from these origins, the fact that Corpus Christi does get cotton from the Rio Grande Valley area of Texas has no bearing other than to demonstate that Corpus Christi is a cotton port and can claim a right to compete for cotton from the origins in this case.

5. Under a "truck allowance system" instituted by the railroads, rail rates are now lower to Houston-Galveston than the truck rates to Corpus Christi. However, on February 23, 1966, Division 2 of the ICC found the allowance system to be unlawful. Allowances for Trucking Baled Cotton, Ark., Okla., Tex., 326 ICC 335 (1966).

If this result flows from the natural advantage and location of Houston-Galveston and the natural disadvantage of Corpus Christi in relation to them, then the ICC lacks authority to equalize the rail rates. "The law does not attempt to equalize fortune, opportunities, or abilities." I. C. C. v. Diffenbaugh, 222 U.S. 42, 46, 32 S.Ct. 22, 24, 56 L.Ed. 83 (1911). " * * * the natural advantage which belongs to a locality does not constitute a preference." Baltimore & O. R. R. v. United States, 151 F.Supp. 258, 275 (D.Md., 1957).

However, there is more to natural advantage and location than geographic mileage differences, and shorter mileage to one port does not automatically give immunity from rate equalization.

"It is true that the law does not attempt to equalize opportunities among localities, Interstate Commerce Commission v. Diffenbaugh, 222 U.S. 42, 46, 32 Sup.Ct. 22, 56 L.Ed. 83, and that the advantage which comes to a shipper merely as a result of the position of his plant does not constitute an illegal preference. * * * To bring a difference in rates within the prohibition of section 3, it must be shown that the discrimination practiced is unjust when measured by the transportation standard. In other words, the difference in rates cannot be held illegal, unless it is shown that it is not justified by the cost of the respective services, by their values, or by other transportation conditions." United States v. Illinois Central Ry., 263 U.S. 515, 524, 44 S.Ct. 189, 193, 68 L.Ed. 417 (1924).

While mileage is important, the "transportation standard" includes other transportation conditions. Boston & M. R. R. v. United States, 202 F.Supp. 830 (D.Mass., 1962), aff'd 373 U.S. 372, 83 S.Ct. 1312, 10 L.Ed.2d 419 (1963), 374 U.S. 859 (1963); Atchison, T. & S. F. Ry. v. United States, 231 F.Supp. 422, 430 (N.D.Ill., 1964); City of Wilmington v. Alabama G. S. Ry., 316 ICC 709, 724-5 (1962). The Commission pointed out that the Corpus Christi and Houston-Galveston ports had been equalized on cotton for a number of years before the railroads voluntarily reduced their rates to Houston. Rail rates for certain other commodities from these origins and others are equalized between the ports, some voluntarily and some by order of the ICC.[6] The ICC found that "The general terrain of the territory over which the defendants operate is the same whether the traffic moves to Corpus Christi or Houston-Galveston." (325 ICC 406). The ICC conclusion that Corpus Christi's disadvantage amounts to undue prejudice was clearly stated: "Transportation conditions are substantially the same from points of origin, although the distances are slightly more to Corpus Christi." (325 ICC 408).

The question of mileage is not a simple one, as the ICC emphasized. The examiner preferred percentage comparisons of short-line distances from 19 selected origins which gave an average difference of 14%. The Corpus Christi interest urged a weighted average which produced smaller variations.[7] The ICC considered the docket No. 28300 distances urged by Galveston interests which

6. These cases are cited because of their role as transportation conditions, and not as legal authority for the order under consideration: Export Grain from Texas to Texas Points, 319 ICC 16 (1963); Nueces County Nav. Dist. No. 1 v. Atchison, T., & S. F. Ry., 315 ICC 155 (1961); Nueces County Nav. Dist. No. 1 v. Abilene & S. Ry., 291 ICC 459 (1954).

7.

| Origin | Galveston | Corpus Christi | Difference |
|--------|-----------|----------------|------------|
| New Mexico | 796 | 811 | 15 |
| Oklahoma | 516 | 613 | 97 |
| Texas | 581 | 648 | 67 |

Houston is 45 miles closer to these origins than Galveston.

showed variations of 120 to 160 miles, or 20% on longer hauls and 60% on shorter hauls. The ICC did not reject the other standards, but emphasized docket No. 28300 distances to give consideration to the greatest mileage differences presented. Using these computations which showed the greatest mileage variations, the ICC made two findings:

(1) "In relating export rates, distance is an important factor; however, equal rates have been required to related ports even where there have been substantial differences in distances." (325 ICC 408).

(2) "Such ranges in distance have existed in prior proceedings from substantially the same origins to the same Texas ports * * * and equal rates have been required." (325 ICC 408.)

The short-line route from Lubbock, Texas, the center of the heavy cotton production area, to Corpus Christi is 67 miles farther than to Galveston, which in turn is 45 miles farther than Houston. The railroads have already equalized Galveston and Houston, so the required equalization here is an additional 22 mile difference on a 646 mile haul.

 The prior equalization of rates from these origins for other commodities is a relevant transportation condition. The ICC concluded that "no different conclusion is warranted in the instant proceedings." (325 ICC 408). This court cannot say that this decision was without a rational basis.[8]

Considering the record and findings as a whole, this court concludes that the ICC gave due consideration to the distance factor, and that its ultimate conclusion was well within its "broad discretion * * * to accommodate the factors of transportation conditions, distance and competition." Ayrshire Col-

lieries Corp. v. United States, supra; 335 U.S. at 593, 69 S.Ct. at 289.

It is therefore the opinion of this court that the ICC order should be enforced and the complaints dismissed.

---

8. Nor is the decision precluded by the ICC's refusal to grant cotton equalization from these origins in 1929. Much has happened since then. Nueces County Nav. Dist. v. Abilene & S. F. Ry., 155 ICC 712 (1929).